16 Cal.App.4th 1019 (1993)
20 Cal. Rptr.2d 666
FLOWMASTER, INC., Petitioner,
v.
THE SUPERIOR COURT OF SONOMA COUNTY, Respondent; DONALD VON DOHLEN, Real Party in Interest.
Docket No. A060508.
Court of Appeals of California, First District, Division One.
June 23, 1993.
*1023 COUNSEL
Laughlin, Falbo, Levy & Moresi and Errol L. Searle for Petitioner.
No appearance for Respondent.
James, Gack, Bernheim & Freeman and Ian Gordon for Real Party in Interest.
OPINION
NEWSOM, J.
Petitioner Flowmaster, Inc. (Flowmaster), is the defendant in plaintiff Donald Von Dohlen's (hereafter plaintiff) civil action for personal injuries incurred by him while operating a hydraulic power press manufactured by Flowmaster. Plaintiff is Flowmaster's employee and was injured while performing his duties as a "parts maker." Flowmaster moved for summary judgment on the ground that plaintiff's suit is barred by the exclusive remedy provisions of the worker's compensation law. (Lab. Code, *1024 § 3600.)[1] The trial court denied the motion, and Flowmaster seeks review by this petition for writ of mandate.
The record shows that Flowmaster is in the business of manufacturing mufflers; it designed, fabricated and assembled hydraulic presses solely for internal use by its employees at the Flowmaster facility. The newest such device was "hydraulic press number 29." Plaintiff was trained in the safe use of the device.
Plaintiff was injured on October 24, 1991, while operating hydraulic press No. 29 (hereafter the press), which had been in use at the Flowmaster plant since September 16, 1991. Specifically, the function of the press was to manufacture a "center brace," described as a "form part" four inches square, "with a hole in it." The operator would initiate the manufacturing process by placing the part in the press, then pressing two electronically activated "deadman switches" with the palms of both hands. Only when both deadman switches were so activated was the operator able to depress a "foot pedal" to initiate the downward stroke of the press, thereby forming the center brace by forcing the cylinder down into the die. The two deadman switches were designed as "point-of-operation guards" to inhibit the "down" or "work" stroke of the press if the hands of the operator entered the point of operation "during the work." Until the deadman switches were pressed with both hands, the descending stroke of the press could not proceed.
Both when it was first designed, and at the time of plaintiff's injury, the press was equipped with a point of operation guard for the down stroke only. The ascending stroke of the cylinder was initiated merely by depressing a foot pedal, without any hand activation of a deadman switch, leaving the operator's hands free. Flowmaster did not consider that the "up" stroke of the press presented a danger, as "there was nothing there to pull the part off." Nor was Flowmaster at the time the press was designed "aware of how" to install a deadman switch for the ascending stroke although it knew that the technology existed to do so. The "standard in the industry" was to "have no control on the upward strokes." With a modification of the wiring, however, the press was capable of functioning with a deadman switch to "stop the `up' stroke." Flowmaster had also designed other hydraulic presses with "light beams" as point of operation guards, which worked on both the descending and ascending strokes, but the light beam system was not dependable and was replaced with deadman switches.
Before plaintiff's accident, the press was modified by addition of a "stripper plate" to "pull the parts off of the tool" during the "up" stroke of *1025 the cylinder. Thus, after the down stroke, the operator depressed the "up" foot pedal to commence the ascending stroke, during which the part was "stripped off the die as it goes up." Plaintiff was injured during the ascending stroke of the cylinder when he placed his left hand on the part being stripped and his fingers became caught between the die-base and the bottom edge of the stripper. As the die retracted into the stripper cylinder, plaintiff's thumb and two fingers were severed.
Immediately following plaintiff's accident, Flowmaster was cited and fined by the Occupational Safety and Health Administration (hereafter OSHA) for failure to properly equip hydraulic presses with point of operation guards. Thereafter, merely by implementing a "simple" and inexpensive change in the "wiring current," Flowmaster was able to equip the press with a deadman switch to inhibit the ascending stroke of the cylinder.
Since plaintiff was injured during the course and scope of his employment, in order to proceed against Flowmaster, he must place himself within a recognized exception to the rule that the exclusive remedy provisions of the workers' compensation law bar a civil action for damages against his employer. (§ 3600; Behrens v. Fayette Manufacturing Co. (1992) 4 Cal. App.4th 1567, 1572 [7 Cal. Rptr.2d 264]; Robomatic, Inc. v. Vetco Offshore (1990) 225 Cal. App.3d 270, 274 [275 Cal. Rptr. 70]; Pichon v. Pacific Gas & Electric Co. (1989) 212 Cal. App.3d 488, 494 [260 Cal. Rptr. 677].) His suit for damages is predicated upon the "power press" exception to the exclusivity rule found in section 4558. (Award Metals, Inc. v. Superior Court (1991) 228 Cal. App.3d 1128, 1132 [279 Cal. Rptr. 459].) Flowmaster contends that the trial court erred in finding the evidence presented in support of the summary judgment motion "insufficient" to negate plaintiff's cause of action pursuant to section 4558.
(1a) In reviewing the trial court's denial of Flowmaster's motion for summary judgment, our task is to determine whether a triable issue of material fact remains to be adjudicated. (Code Civ. Proc., § 437c, subd. (c); Miller v. Bechtel Corp. (1983) 33 Cal.3d 868, 874 [191 Cal. Rptr. 619, 663 P.2d 177]; Cohen v. Southland Corp. (1984) 157 Cal. App.3d 130, 137 [203 Cal. Rptr. 572].) It is not the function of a summary judgment proceeding to decide the merits of issues but merely to ascertain whether issues of fact exist to be tried. (Onciano v. Golden Palace Restaurant, Inc. (1990) 219 Cal. App.3d 385, 391 [268 Cal. Rptr. 96]; Anaya v. Turk (1984) 151 Cal. App.3d 1092, 1106 [199 Cal. Rptr. 187].) "`... If there is any issue of material fact to be tried, summary judgment must be denied.' [Citation.]" (Salasguevara v. Wyeth Laboratories, Inc. (1990) 222 Cal. App.3d 379, 383 [271 Cal. Rptr. 780].) (2) "`"A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's *1026 asserted causes of action can prevail. [Citation.] ..."'" (Marketing West, Inc. v. Sanyo Fisher (USA) Corp. (1992) 6 Cal. App.4th 603, 610 [7 Cal. Rptr.2d 859].) To succeed, a defendant moving for summary judgment must "conclusively negate a necessary element of the plaintiff's case or establish a complete defense and thereby demonstrate that under no hypothesis is there a material factual issue which requires the process of a trial." (Platts v. Sacramento Northern Ry. (1988) 205 Cal. App.3d 1025, 1032 [253 Cal. Rptr. 269], internal quotation marks omitted; see also Walker v. Blue Cross of California (1992) 4 Cal. App.4th 985, 990 [6 Cal. Rptr.2d 184]; Walsh v. Bronson (1988) 200 Cal. App.3d 259, 264 [245 Cal. Rptr. 888].)
(3) "The aim of the [summary judgment] procedure is to discover, through the media of affidavits, whether the parties possess evidence requiring the weighing procedures of a trial. In examining the sufficiency of affidavits filed in connection with the motion, the affidavits of the moving party are strictly construed and those of his opponent liberally construed, and doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion." (Reid v. State Farm Mut. Auto. Ins. Co. (1985) 173 Cal. App.3d 557, 570 [218 Cal. Rptr. 913], internal quotation marks omitted.) (1b) We conduct a de novo examination of the evidence and independently review the trial court's determination of questions of law. (Buic v. Buic (1992) 5 Cal. App.4th 1600, 1604 [7 Cal. Rptr.2d 738]; Onciano v. Golden Palace Restaurant, Inc., supra, 219 Cal. App.3d at p. 391; Decker v. City of Imperial Beach (1989) 209 Cal. App.3d 349, 353 [257 Cal. Rptr. 356].) "`... However, a motion for summary judgment is addressed to the sound discretion of the trial court, so that absent a clear showing of abuse, the judgment will not be disturbed on appeal. [Citation.]' (Hoffman v. Citadel General Assurance, Ltd., supra, 194 Cal. App.3d 1356, 1362 [240 Cal. Rptr. 253]; see also Fireman's Fund Ins. Co. v. Fibreboard Corp., supra, 182 Cal. App.3d 462 at p. 466 [227 Cal. Rptr. 203]; Taylor v. Fields (1986) 178 Cal. App.3d 653, 660 [224 Cal. Rptr. 186].)" (Saldana v. Globe-Weis Systems Co. (1991) 233 Cal. App.3d 1505, 1514 [285 Cal. Rptr. 385].)
The essential liability provision of section 4558 is found in subdivision (b), which states: "An employee, or his or her dependents in the event of the employee's death, may bring an action at law for damages against the employer where the employee's injury or death is proximately caused by the employer's knowing removal of, or knowing failure to install, a point of operation guard on a power press, and this removal or failure to install is specifically authorized by the employer under conditions known by the employer to create a probability of serious injury or death." (4a) "A cause of action under section 4558 includes the following elements: (a) that the injury or death is proximately caused by the employer's knowing removal of, or knowing failure to install, a point of operation guard on a power *1027 press; and (b) that this removal or failure to install is specifically authorized by the employer under conditions known by the employer to create a probability of serious injury or death. (2 Witkin, Summary of Cal. Law (9th ed. 1987) Workers' Compensation, § 57, p. 618.)" (Saldana v. Globe-Weis Systems Co., supra, 233 Cal. App.3d 1505, 1516.)
(5a) As no evidence of "removal" of a point of operation guard is revealed by the record,[2] plaintiff must seek recovery under section 4558 for "failure to install" the requisite device, as that phrase is defined in subdivision (a)(2): "omitting to attach a point of operation guard either provided or required by the manufacturer, when the attachment is required by the manufacturer and made known by him or her to the employer at the time of acquisition, installation, or manufacturer-required modification of the power press." Subdivision (c) of section 4558 further specifies that "[n]o liability shall arise under this section absent proof that the manufacturer designed, installed, required, or otherwise provided by specification for the attachment of the guards and conveyed knowledge of the same to the employer. Proof of conveyance of this information to the employer by the manufacturer may come from any source."
Thus, under subdivisions (a)(2) and (c), liability for "failure to install" a point of operation guard under section 4558 must be predicated upon evidence that the "manufacturer" either provided or required such a device, which was not installed by the employer. (Swanson v. Matthews Products, Inc. (1985) 175 Cal. App.3d 901, 906 [221 Cal. Rptr. 84].) The issues before us, which have not heretofore been resolved, center on the definition of "manufacturer," and specifically whether that term includes an employer; and the meaning of the terms "provided" or "required" by the manufacturer, where, as here, there is no manufacturer other than the employer. In order to properly interpret the statute, we must ascertain the intent of the Legislature, which, in the factual context presented to us, is far from clearly expressed. (Nickelsberg v. Workers' Comp. Appeals Bd. (1991) 54 Cal.3d 288, 294 [285 Cal. Rptr. 86, 814 P.2d 1328]; Seidler v. Municipal Court (1993) 12 Cal. App.4th 1229, 1234 [16 Cal. Rptr.2d 90]; Agresti v. Department of Motor *1028 Vehicles (1992) 5 Cal. App.4th 599, 604 [7 Cal. Rptr.2d 353]; Estate of Sanders (1992) 2 Cal. App.4th 462, 470 [3 Cal. Rptr.2d 536].) (6) The language used in statutes must be examined, giving significance to every word, phrase, sentence and part of an act in furtherance of the legislative purpose. (Nickelsberg, supra, at p. 294; People v. Pieters (1991) 52 Cal.3d 894, 898 [276 Cal. Rptr. 918, 802 P.2d 420]; Redevelopment Agency v. Arvey Corp. (1992) 3 Cal. App.4th 1357, 1362 [5 Cal. Rptr.2d 161]; Estate of Sanders, supra, 2 Cal. App.4th at p. 470.) Our interpretation of section 4558 must "avoid literal, narrow or hypertechnical meanings of words so as to give effect to the manifest objectives of the legislation which appear from the provisions considered as a whole, in light of legislative history. (California Ins. Guarantee Assn. v. Liemsakul, supra, 193 Cal. App.3d at p. 439 [238 Cal. Rptr. 346].)" (Bingham v. CTS Corp. (1991) 231 Cal. App.3d 56, 65 [282 Cal. Rptr. 161].) Matters to be considered include the context of the legislation, the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy, and contemporaneous construction. (Agresti v. Department of Motor Vehicles, supra, at p. 604; DeYoung v. City of San Diego (1983) 147 Cal. App.3d 11, 18 [194 Cal. Rptr. 722]; United Business Com. v. City of San Diego (1979) 91 Cal. App.3d 156, 170 [154 Cal. Rptr. 263].)
We have been presented with policy considerations which are not easily reconciled in the context of the case before us. (7) In all cases "`[a] determination whether a cause of action is barred by the exclusive remedy provisions of the workers' compensation law must take into account not only the facts alleged (i.e., of physical injury) but also their relation to the scope and purposes of the workers' compensation statutory scheme.' (Shoemaker II, supra, 52 Cal.3d at p. 13 [276 Cal. Rptr. 303, 801 P.2d 1054].)" (Shoemaker v. Myers (1992) 2 Cal. App.4th 1407, 1416-1417 [4 Cal. Rptr.2d 203].) "The test for deciding whether a claimant may pursue a tort action or is confined to a workers' compensation proceeding is whether the acts complained of are normally within an employer-employee relationship. [Citations.]" (Robomatic, Inc. v. Vetco Offshore, supra, 225 Cal. App.3d at p. 274.) "If the duty flows solely from the employment relationship and the injury `arises out of' and `during the course of' that employment, then the recited policy considerations behind the exclusive remedy in workers' compensation mandating that the employer be immune from tort liability have viability. If, however, an additional concurrent duty flows from an `extra' employer status or a relationship that is distinct from that of employer-employee and invokes a different set of obligations, then a second capacity arises and the employer status is coincidental. The employer should then be treated as any third party tortfeasor, not immune from a common law tort action. [Citations.]" (Bell v. Industrial Vangas, Inc. (1981) 30 Cal.3d 268, 277 [179 Cal. Rptr. 30, 637 P.2d 266].)
*1029 "Section 4558 was enacted as part of an extensive overhaul of the workers compensation system designed to address perceived inadequacies in the rules." (Jones v. Keppeler (1991) 228 Cal. App.3d 705, 709 [279 Cal. Rptr. 168].) The exclusive remedy rules were strengthened, and the power press exception embodied in section 4558 became one of "only four circumstances under which a worker could bring a civil action against the employer." (228 Cal. App.3d at p. 709.)[3] (4b) "The obvious legislative intent and purpose in section 4558 is to protect workers from employers who wilfully remove or fail to install appropriate guards on large power tools. Many of these power tools are run by large mechanical motors or hydraulically. (Cal. Admin. Code, tit. 8, § 4188.) These sorts of machines are difficult to stop while they are in their sequence of operation. Without guards, workers are susceptible to extremely serious injuries." (Ceja v. J.R. Wood, Inc. (1987) 196 Cal. App.3d 1372, 1377 [242 Cal. Rptr. 531]; see also Graham v. Hopkins (1993) 13 Cal. App.4th 1483, 1489 [17 Cal. Rptr.2d 82]; Saldana v. Globe-Weis Systems Co., supra, 233 Cal. App.3d 1505, 1516; Bingham v. CTS Corp., supra, 231 Cal. App.3d at p. 65.) Thus, the Legislature has determined that recovery for injuries incurred during the course and scope of employment is limited to workers' compensation benefits, but at the same time has recognized that employees who must use power presses, such as plaintiff, potentially require additional protection and compensation from the employer in a civil action in the event of injury.
(5b) Flowmaster insists that where the employer and manufacturer are the same entity, the section 4558 exception to the exclusivity rule is simply unavailable to an employee injured by a power press. Flowmaster further argues that even if section 4558 may be interpreted to include the employer-manufacturer of a power press, no liability may attach in the case before us absent evidence that the press was designed and manufactured to include a point of operation guard for the upward cycle of the machine, which was then either removed or not installed as specified. Flowmaster also emphasizes that the record contains no evidence that a manufacturer communicated knowledge of specifications to an employer for attachment of point of operation guards.
Nothing in the language, history or objectives underlying section 4558 convinces us that the Legislature intended that section 4558 would immunize employers who design, manufacture and install their own power presses *1030 without point of operation guards. A manufacturer is defined broadly in section 4558 as a "designer, fabricator, or assembler of a power press." (§ 4558, subd. (a)(3); Swanson v. Matthews Products, Inc., supra, 175 Cal. App.3d 901, 906.) An "employer" is not excluded from the definition of a manufacturer, nor would doing so promote the objectives of the statute. By including section 4558 within the limited list of exceptions to the exclusivity rule, the Legislature has obviously recognized the extreme risk of serious harm to employees inherent in the use of power presses without guards to stop the sequence of operation. The intended protection afforded by section 4558 would seem no less imperative where the employer is itself the manufacturer of a power press.[4] And when an employer has stepped out of the role of merely providing a work place, to become as well the manufacturer of large power tools used in the production process, "an `extra' employer status or a relationship" has been created which "invokes a different set of obligations," potentially rendering the employer subject to liability as "any third party tortfeasor." (Cf. Bell v. Industrial Vangas, Inc., supra, 30 Cal.3d at p. 277; Watters Associates v. Superior Court (1991) 227 Cal. App.3d 1341, 1346 [278 Cal. Rptr. 417].)
We are urged to limit an employer's liability under section 4558 only to those cases in which it fails to install, or removes after installation, a point of operation guard that was already incorporated in plans and specifications for a power press. We cannot construe the statute in this manner, as to do so would in effect immunize the employer-manufacturer who, knowing the risk involved, nonetheless deliberately omitted specification and installation of the guard. Words used in a statute "should be construed in context, and ... given such `interpretation as will promote rather than defeat the general purpose and policy of the law.' [Citation.]" (People v. Monroe (1993) 12 Cal. App.4th 1174, 1184 [16 Cal. Rptr.2d 267], italics omitted.) Given the objectives of section 4558, we can make no logical distinction between an employer-manufacturer who removes, or fails to install, a guard which has been included in power press plans or specifications, and one who, knowing the risks, wilfully omits the guard from its own specifications.[5]
The phrase "designed, installed, required, or otherwise provided by specification for the attachment of the guards" in section 4558, subdivision (c) is *1031 phrased disjunctively. (Bingham v. CTS Corp., supra, 231 Cal. App.3d at p. 66.) If an inference can be drawn from the evidence that any of the terms above applies to the employer, liability may attach. (Ibid.)
We conclude that in an action against an employer-manufacturer of a power press, for failure to install a guard (§ 4558, subd. (a)(2)), the plaintiff must prove that the employer's own design of the press provided for a guard which was later removed or never installed; or, alternatively, that one was "required" to protect against a known risk of serious injury, but was deliberately omitted by the employer from the design fabrication or assembly of the machine.[6] Under our interpretation of section 4558 an employer may be liable even if the design of the press did not "provide" for attachment of a guard, as long as a guard was "required" to protect against a known risk of serious injury, and the press was capable of functioning with the required guard. The employee is thus protected as intended by section 4558, and the employer-manufacturer is liable only for an affirmative, wilful act of removal or for failure to install the guard.[7]
(8) As in any action under section 4558, an employee proceeding against an employer-manufacturer must prove more than merely an injury negligently and proximately caused by "the absence of a point of operation guard on a power press." (Award Metals, Inc. v. Superior Court, supra, 228 Cal. App.3d at p. 1133.) The element of knowledge requires "actual awareness" by the employer  rather than merely constructive knowledge  that a point of operation guard has either been provided for or is required to *1032 prevent the probability of serious injury or death. (Saldana v. Globe-Weis Systems Co., supra, 233 Cal. App.3d at pp. 1516-1517.)[8] "Absent facts which would establish the employer's knowledge or action regarding the absence of a point of operation guard on a power press, the incident would not come within the exception of section 4558, and an employee would not be entitled to bring `an action at law for damages' arising from the power press injury." (Award Metals, Inc. v. Superior Court, supra, 228 Cal. App.3d at p. 1134.) And, as we have observed, the employee must further prove that the employer or manufacturer "specifically authorized" the removal or noninstallation of point of operation guard. (Ibid.; see also Swanson v. Matthews Products, Inc., supra, 175 Cal. App.3d at p. 908.) Specific authorization demands evidence of an affirmative instruction or other wilful acts on the part of the employer despite actual knowledge of the probability of serious harm. (§ 4558, subd. (a)(6).)[9]
(9) Turning to the evidence before us, we find recognition by Flowmaster of the risk posed by the ascending cycle of the press based upon testimony that the design of the first hydraulic press included a light beam safety device which was capable of stopping both the down and up strokes of the cylinder  a system which was later abandoned as unreliable. The deposition testimony indicates that the upward stroke of the cylinder was not considered dangerous by Flowmaster when the press was designed. Once the stripper plate was added, however, a reasonable inference from the evidence  abbreviated and confusing though the record may be  is that Flowmaster was then aware that a part was "stripped" from the press during the "up" cycle of the cylinder, creating an obvious risk of amputation or other serious injury to the operator's hands. Flowmaster took no action to install a device to prevent the sequence of operation of the power press on the ascending cycle following the addition of the stripper plate. Only after the injury to plaintiff and a citation for a violation of safety regulations by OSHA did Flowmaster add  without serious difficulty or expense  a point of operation guard to the press. Liberally construing the evidence presented by plaintiff, as we must, triable issues of fact exist, which include: whether a point of operation guard was "required" and capable of being provided in order to prevent conditions known by Flowmaster to create a probability of serious injury or death to plaintiff on the ascending stroke of the press cylinder; and whether Flowmaster specifically authorized noninstallation of *1033 a point of operation guard on the ascending cycle by wilfully failing to modify the design and assembly of the press to include the required safety device. Accordingly, the trial court did not abuse its discretion in refusing to grant summary judgment in favor of Flowmaster. The order to show cause is therefore discharged and the petition for writ of mandate is denied.
Strankman, P.J., and Stein, J., concurred.
Petitioner's application for review by the Supreme Court denied September 16, 1993.
NOTES
[1] All further statutory references are to the Labor Code unless otherwise indicated.
[2] In his deposition testimony, Ray Flugger, president of Flowmaster, indicated that "the first press" designed by Flowmaster was equipped with "light beam" point of operation guards which could be operated to stop both the downward and upward strokes of the press. The light control system was abandoned when "it became obvious" that the deadman switches were more reliable. Thus, by design, Flowmaster removed a point of operation guard which may have been operative on the ascending cycle, in favor of a more dependable deadman switch limited to the "down" stroke. We do not consider Flugger's testimony in this regard as proof of any "removal" of a point of operation guard within the meaning of section 4558. It is undisputed that the press used by plaintiff never included any form of point of operation guard to stop the "up" stroke of the machine. Plaintiff is relegated to proof of "failure to install" by Flowmaster to establish his cause of action under section 4558.
[3] The other three exceptions include: "(1) injury caused by the employer's willful physical assault; (2) injury aggravated by the employer's fraudulent concealment of the existence of the injury and its connection with employment; and (3) injury caused by a defective product manufactured by the employer and sold to a third party but used by the employee in his work. (See § 3602.)" (228 Cal. App.3d at p. 709, fn. 6.)
[4] In fact, we think the employees' need for protection may be greater in this instance. The employer who designs, fabricates and assembles a power press for "in-house" use may not have the expertise or knowledge of safety requirements possessed by those in the trade.
[5] Not only is the employee just as likely to be injured and the employer just as culpable, but where the employer is also the manufacturer of the power press, the employee has no recourse against a third party tortfeasor other than his employer, as he would have if the power press had been provided by a separate entity manufacturer. We observe in this regard that in such a case the plaintiff is also precluded from proceeding against the employer under the "dual capacity doctrine" (§ 3602, subd. (b)(3)), which requires the employee to use the product manufactured and distributed by the employer into the stream of commerce as a consumer rather than an object of employment. (Cf. Behrens v. Fayette Manufacturing Co., supra, 4 Cal. App.4th 1567, 1574-1575; Watters Associates v. Superior Court, supra, 227 Cal. App.3d at p. 1346.)
[6] Obviously, when proceeding against an employer-manufacturer, the employee will never be able to prove that a separate entity manufacturer provided or required a point of operation guard.
[7] We refer to a letter of intent in regard to Assembly Bill No. 684 which enacted the power press exception, written by Senator Daniel E. Boatwright and printed in the Senate Journal; in part it states: "The bill creates a further, final, exception to exclusive remedy and allows a civil cause of action by an employee where injury results from the removal of a safety guard from a power press or failure to install such guards on a power press. However, such removal or failure to install must have been specifically authorized by the employer under conditions known by the employer to create a probability of serious injury or death and the employer must have been notified by the manufacturer of the power press that the guards were required. This very narrow exception to the exclusive remedy provisions is designed to correct intentional abuses involving power presses only." (8 Sen. J. (1981-1982 Reg. Sess.) dated Aug. 31, 1982, at pp. 14417-14418, italics added; see also Perry v. Heavenly Valley (1985) 163 Cal. App.3d 495, 501-502, fn. 5 [209 Cal. Rptr. 771].)
[8] Whether and by what means the employer has become aware of the need for the guard may be demonstrated by proof "from any source." (§ 4558, subd. (c).)
[9] "`Specifically authorized' means an affirmative instruction issued by the employer prior to the time of the employee's physical injury or death, but shall not mean any subsequent acquiescence in, or ratification of, removal of a point of operation safety guard." (§ 4558, subd. (a)(6).)