[No. A070403. First Dist., Div. One. Feb. 1, 1996.]

MASONITE CORPORATION, Plaintiff and Appellant, v.
COUNTY OF MENDOCINO AIR QUALITY MANAGEMENT
DISTRICT, Defendant and Respondent;
CITIZENS FOR A HEALTHY UKIAH, Real Party in Interest and
Respondent.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part IV.

438

**COUNSEL**

McCutchen, Doyle, Brown & Enersen, Barry Goode, William D. Kissinger and Trenton H. Norris for Plaintiff and Appellant.

H. Peter Klein, County Counsel, and Sandra L. Applegate, Deputy County Counsel, for Defendant and Respondent.

James R. Wheaton and Elizabeth Pritzker for Real Party in Interest and Respondent.

**OPINION**

**SWAGER, J.**—The trial court granted in part and denied in greater part the motion for preliminary injunction of appellant Masonite Corporation (hereafter Masonite or appellant) to enjoin respondent County of Mendocino Air Quality Management District (hereafter the District) from disclosing to the real party in interest, Citizens for a Healthy Ukiah (hereafter CHU), information contained in reports filed pursuant to the Air Toxics "Hot Spots" Information and Assessment Act of 1987 (Health & Saf. Code, § 44300 et

seq.)[1] claimed by Masonite to be protected "trade secrets" under section 44346. In this appeal, Masonite challenges the trial court's denial of trade secret status to information classified as "emission factors," and the findings that Masonite waived any trade secret privilege for material in the reports disclosed to the public by either Masonite or public agencies and designated as "Category 2, 3 and 4" information. Masonite also claims that the trial court improperly required an undertaking of $100,000 to be filed as a condition of the injunctive relief granted.

We conclude that emission factors qualify as protected trade secrets under the Act, and find that Masonite waived the trade secret privilege only for "Category 2" information—that is, information publicly and intially disclosed by Masonite rather than by public agencies. We further find that the trial court did not err by requiring Masonite to file a $100,000 undertaking under Code of Civil Procedure section 529. We accordingly affirm the judgment in part and reverse in part.

STATEMENT OF FACTS AND PROCEDURAL HISTORY

As a facility operator defined by the Act (§§ 44304, 44307), in September of 1992 and April of 1993 Masonite submitted to the District the requisite emissions inventory reports (§ 44341) and health risk assessments (§ 44360) in both censored and uncensored versions, with the former redacting information designated by Masonite as trade secrets.[2] The District was asked by Masonite to maintain the confidentiality of the trade secrets contained in the reports. (§ 44346). This complex and protracted litigation was triggered when, in August of 1993, CHU filed a request with the District for the uncensored copies of the reports. Masonite then filed the present action for declaratory and injunctive relief to prevent the District from releasing information identified in the reports as trade secrets (§ 44346). CHU intervened in the action.

A temporary restraining order was issued by the trial court which enjoined disclosure by the District of the information identified by Masonite as trade

[1]The Air Toxics "Hot Spots" Information and Assessment Act of 1987 will hereafter be referred to as the "Act." All further statutory references are to the Health and Safety Code unless otherwise indicated; all references to "Regulations" are to title 17 of the California Code of Regulations which have been promulgated by the State Air Resources Board (hereafter the Board) pursuant to authority granted by section 44342.

[2]For the sake of convenience, the emissions inventory reports and health risk assessments will be referred to collectively as the reports when we need not distinguish between them. We hereby grant the motion of CHU to strike from the record on appeal Masonite's reply appendix, designated as exhibits 74 and 75, but deny the motion to augment the record with the unredacted reports, which we deem unnecessary to resolution of the issues presented in this appeal. (Cal. Rules of Court, rule 12(a).)

secrets, but it was subsequently dissolved following a hearing and denial of Masonite's motion for a preliminary injunction. The trial court decided that Masonite waived all claims of trade secrets by failing to properly specify them on facility diagrams as required by Regulations, sections 93312 and 93321. Masonite subsequently filed a petition for writ of mandate with this court, and we ruled that section 93321, subdivision (c) of the Regulations upon which the trial court relied to find a waiver, "must be declared void as inconsistent with the enabling legislation." (*Masonite Corp.* v. *Superior Court* (1994) 25 Cal.App.4th 1045, 1054 [31 Cal.Rptr.2d 173], hereafter *Masonite I.*) We concluded that under section 44346, subdivision (a), "Masonite properly asserted trade secrets in writing in the report, defeating any claim of waiver on that ground," and directed the trial court "to reinstate its prior temporary restraining order and its sealing order, and to proceed with any unresolved issues in the case . . . ." (25 Cal.App.4th at pp. 1054, 1058.)

Upon receipt of the remittitur, the trial court received additional evidence and argument on Masonite's motion for preliminary injunction. Based upon the evidence presented and with the approval of the parties, the trial court categorized the information for which Masonite sought trade secret protection as follows: category 1 is information, including emission factors, not previously disclosed except to the District in the censored reports; category 2 is information Masonite initially disclosed to the District in uncensored reports, but subsequently identified as trade secrets; category 3 is information for which Masonite claimed trade secret protection in the reports filed with the District, but which was disclosed to "an environmental law organization" by the state Office of Environmental Health Hazard Assessment (hereafter the OEHHA); and category 4 is information for which Masonite claimed trade secret protection in the reports filed with the District, but which was disclosed to an environmental organization by the United States Environmental Protection Agency (hereafter the EPA).

In an interim ruling issued on September 6, 1994, the trial court found that Masonite's failure to assert trade secret claims in the reports for category 2 information was "inadvertent," but nevertheless constituted a waiver of "trade secret protection as to all of it" under section 44346, subdivision (a). Masonite was ordered to lodge with the court a "new redacted version" of its reports "with all the Category 2 information disclosed," and to provide copies thereof to both the District and CHU. As to the category 3 and 4 information, the court found that the disclosure by the OEHHA and the EPA was inadvertent and did not "transform any legitimate non-public record, trade secret information into a public record" as defined by Government

Code section 6254.5. An in camera review of the category 1, 3 and 4 information was scheduled, and the parties were ordered to submit "separate statements" which enumerate the specific "redacted facts" for which trade secret protection has been claimed and contested, along with supporting reasons and evidence. A final ruling on the motion for preliminary injunction was deferred pending receipt by the court of the separate statements[3] and additional argument.

In June of 1995, following further hearings, the trial court issued a tentative statement of decision. In it, the court clarified the interim ruling by reiterating that Masonite must disclose "all the Category 2 information," wherever previously stated, in the new redacted versions of the reports, not just the references "in those locations in the documents where the information had previously been disclosed and then covered up." Findings were also made as to the other categories of information still at issue. In a change from its earlier interim ruling, the court declared that the category 3 and 4 information which had been inadvertently and mistakenly disclosed by public agencies to environmental organizations is no longer "known only to certain individuals within a commercial concern," and thus is a "public record" rather than a protected "trade secret" as defined in subdivision (d) of Government Code section 6254.7. No "significant harm" to Masonite from "disclosure . . . of information that has already been disclosed" was found. The court acknowledged the potential "substantial economic harm" to Masonite upon release of "information not yet disclosed" and which "presumptively qualifies as 'trade secrets,' " including " 'emissions factors,' " but was "persuaded that an injunction ordering nondisclosure of Masonite's redacted information will prevent the public from evaluating and knowing the actual public health significance of risks associated with Masonite's emissions." The harm to the public from affording trade secret protection to "emission factors" was found to substantially outweigh "the harm to Masonite from disclosure of . . . such data."

Thus, the trial court denied Masonite's motion for a preliminary injunction to prevent further disclosure as public records of emission factors and all previously disclosed category 2, 3 and 4 information.[4] All other disputed information was determined to be "probably a trade secret," and upon a balancing of the relative harm to the parties, disclosure of it by the District

---

[3]The separate statements were filed by the parties as ordered and are part of the record on appeal. We applaud the trial court's efforts, which we think have been effective, to bring organization to this case from chaos by requiring the separate statements from the parties and categorizing the information as appropriate to the legal issues presented.

[4]After an in camera examination of the numerous specific redacted items of category 2, 3 and 4 information in Masonite's reports, the court individually denied the request for trade

was enjoined. Masonite was also directed to furnish the District and CHU, by no later than June 16, 1995, with new redacted versions of its reports which include all of the information ordered to be disclosed. We subsequently granted Masonite's petition for writ of supersedeas to stay the effect of the trial court's order denying the motion for preliminary injunction pending the present appeal. (Code Civ. Proc., §§ 916, 923.)[5]

DISCUSSION

## I. *Emission Factors*

■ Masonite complains that the trial court erred by classifying emission factors as "emission data" and, therefore, unprivileged "public records" under Government Code section 6254.7, subdivision (e),[6] rather than "data used to calculate emission data" which "are not public records" and may be protected as "trade secrets" under section 44346. It maintains that emission factors do not fall within the definition of "emission data" found in Government Code section 6254.7, subdivision (a) or the Regulations, but instead have been specifically identified in section 93321, subdivision (b) of the Regulations as "data used to calculate emissions data." CHU insists that emission factors refer to the rate of air pollution or contaminants under section 93355 of the Regulations, and hence must be considered public records as defined in subdivisions (a) and (b) of Government Code section 6254.7.

■ The issue of statutory interpretation is one of law which we review de novo. (*Masonite I, supra,* 25 Cal.App.4th at p. 1050.) ■ Our task is "to effectuate the intent of the Legislature, to the extent we are able to ascertain it. [Citations.] We must give effect to the manifest objectives of the legislation, which appear from the provisions considered as a whole, in light of the legislative history and public policy considerations. ([*Flowmaster, Inc.* v. *Superior Court* (1993) 16 Cal.App.4th 1019, 1028 (20 Cal.Rptr.2d 666)]; *Agresti* v. *Department of Motor Vehicles* (1992) 5 Cal.App.4th 599, 604 [7

secret protection for each redacted data item, with an accompanying statement of reasons given in appendices to the statement of decision.

[5]Our stay order left intact the requirement that Masonite file a $100,000 undertaking. We also directed Masonite to prepare two unredacted versions of its documents—one set with all category 2 information unredacted, the other without redacting any of the information ordered disclosed by the superior court—and to lodge both under seal in the superior court. Masonite has complied with this order.

[6]Government Code section 6254.7, subdivision (e) provides: "Notwithstanding any other provision of law, all air pollution emission data, including those emission data which constitute trade secrets as defined in subdivision (d), are public records. Data used to calculate emission data are not emission data for the purposes of this subdivision and data which constitute trade secrets and which are used to calculate emission data are not public records."

Cal.Rptr.2d 353]; *Bingham* v. *CTS Corp.* (1991) 231 Cal.App.3d 56, 65 [282 Cal.Rptr. 161].) The statutory language 'must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible.' (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323].)" (*Id.* at p. 1055.)

We delineated the essential statutory scheme which differentiates discoverable public records from privileged trade secrets in *Masonite I.* Under the "various and confusing provisions of section 44346 and Government Code section 6254.7 which govern the nature and content of information accorded protection as trade secrets," all materials submitted to a district by a facility operator such as Masonite pursuant to the Act "are public records according to Government Code section 6254.7, subdivision (a), as are pollution monitoring data under subdivision (b). 'Trade secrets,' as defined in subdivision (d) of Government Code section 6254.7, are 'not public records.' " (*Masonite I, supra,* 25 Cal.App.4th at p. 1055, fn. omitted.)

"While Government Code section 6254.7 is clouded in its attempt to distinguish between pollution disclosures which are 'public records' and those which are protected as 'trade secrets,' we consider that two categories of information are accorded clear and definitive treatment under subdivision (e): 'all air pollution emission data' are public records and not entitled to protection from disclosure even if otherwise defined as trade secrets within the meaning of section 6254.7, subdivision (d); but, in crucial contradistinction, all '[d]ata used to calculate emission data are *not* emission data' (italics added) and, therefore, if classifiable as trade secrets under subdivision (d) must be protected from disclosure. Finally, the directive in Government Code section 6254.7 that trade secrets are 'not public records' is, we believe, a mandate to districts to treat as trade secrets any information or data which meets [the] definition provided in subdivision (d), even if also defined as 'public records' in subdivision (a)—excluding only 'air pollution emission data,' which must always be classified as public records." (*Masonite I, supra,* 25 Cal.App.4th at pp. 1055-1056.) Under section 44346, subdivision (h), all information collected in reports pursuant to chapter 3 is considered " 'air pollution emission data' " and hence a public record, "with the specific and sole exception of 'data used to calculate emissions data required in the facility diagram.' " (25 Cal.App.4th at p. 1056, fn. omitted.)

The critical terms "emissions data" and "data used to calculate emission data" are not further defined in the Act, but section 93321, subdivision (b) of

the Regulations, which has the force and effect of a statute (*Masonite I*, *supra*, 25 Cal.App.4th at p. 1052; *Associated Beverage Co.* v. *Board of Equalization* (1990) 224 Cal.App.3d 192, 201 [273 Cal.Rptr. 639]), specifically includes within the definition of data used to calculate emissions, "process rate, operating schedule, equipment capacity, *emission factors*, and feed composition." (Italics added.) We cannot ignore the enumeration in section 93321, subdivision (b) of the Regulations of emission factors as data used to calculate emission data, nor, in contrast, the failure of the Act or Regulations to designate emission factors as emission data. Further, in paragraph (25) of appendix B to section 93355 of the Regulations, an "emission factor" is described as "[t]he average rate at which the pollutant is actually being emitted to the atmosphere in [pounds] per process unit," a measurement which, the evidence demonstrates and the trial court recognized, necessarily, if indirectly, reveals the "production data" of the facility operator, a listed trade secret under Government Code section 6254.7, subdivision (d). We are accordingly compelled by the statutory language to conclude that emission factors are, as stated without reservation or limitation, data used to calculate emission data, and consequently qualify for protection as trade secrets.

CHU argues that section 93321, subidivision (b) of the Regulations must be declared "void" as contrary to the provisions of the Act, or at least interpreted to exclude emission factors from classification as trade secrets except "in the very rare circumstance" in which such information is otherwise "necessary data used to calculate emissions *required in a facility diagram*" as provided in section 44346, subdivision (h). CHU urges us to narrow the category of data used to calculate emissions data required in a facility diagram to "the specific equipment used and the other inputs to the manufacturing process, such as proprietary materials. In brief, what goes into the product." CHU observes that under Government Code section 6254.7, subdivisions (a), (b) and (e), all air pollution emission data which disclose the nature and extent of contaminants are public records. An emission factor, submits CHU, "is the quintessential description" of pollution output, and must be subject to disclosure to promote the primary objective of the Act to ascertain and evaluate the amounts and types of hazardous releases from specific sources. (§ 44301, subds. (g) and (h).)

While we agree with CHU that disclosure of emission factors facilitates evaluation of air pollution emission data, as do many other measurements or specifications, we must adhere to the legislative classification of emission factors as information which is not a public record under Government Code section 6254.7, subdivision (e). The Act and the Regulations promulgated pursuant to it evince a balancing of the need for public awareness of

pollution data with the interest of facility operators in maintaining the confidentiality of privileged trade secrets. The reports and facility diagrams submitted by an operator must contain a comprehensive characterization of the full range and quantity of hazardous materials discharged from the facility, the emission characteristics and exposure rates for each substance, the sources of emissions, and a myriad of additional information which reflects upon the nature and extent of contaminants released. (See §§ 44340, 44342; Regs., §§ 93311, 93320, 93321, 93323, 93332, 93334.) Emissions must be calculated and reported as annual and maximum hourly emissions. (Regs., §§ 93323, 93331, 93340.) Of the information demanded from the facility operator in a facility diagram, only data used to calculate emission data are not classified as public records, and only emission factors as an estimation technique have been specifically identified as trade secrets. (Gov. Code, § 6254.7, subd. (e); Regs., § 93321, subd. (b).) Thus has the legislative and regulatory scheme provided for broad public disclosure of information bearing upon air pollution data, with limited exceptions for trade secrets which specifically include emission factors.

We do not think the narrow exclusion of emission factors from the scope of discoverable public records so contravenes the objectives of the Act that we must declare section 93321, subdivision (b) of the Regulations void as beyond the extent of authority delegated to the Board by the governing statute to promulgate emission plans and reports. ■ As we observed in *Masonite I*: " ' "Where the Legislature has delegated to an administrative agency the responsibility to implement a statutory scheme through rules and regulations, the courts will interfere only where the agency has clearly overstepped its statutory authority or violated a constitutional mandate." (*Ford Dealers Assn.* v. *Department of Motor Vehicles* (1982) 32 Cal.3d 347, 355-356 [185 Cal.Rptr. 453, 650 P.2d 328], fn. omitted.)' (*Stoneham* v. *Rushen* (1984) 156 Cal.App.3d 302, 308 [203 Cal.Rptr. 20].) ' "The scope of our review of an administrative agency's regulations is limited: we consider whether the challenged provisions are consistent and not in conflict with the enabling statute and reasonably necessary to effectuate its purpose." (*Fox* v. *San Francisco Residential Rent etc. Bd.* (1985) 169 Cal.App.3d 651, 655 [215 Cal.Rptr. 565].) "In enacting such rules and regulations, the Board is empowered to fill up the details of the enabling legislation. [Citation.] The court's role is to decide whether in enacting the specific rule the Board reasonably interpreted the legislative mandate." (*Id.* at p. 656, internal quotation marks omitted.)' (*Da Vinci Group* v. *San Francisco Residential Rent etc. Bd.* (1992) 5 Cal.App.4th 24, 29-30 [6 Cal.Rptr.2d 461]; see also *San Bernardino County Sheriff's etc. Assn.* v. *Board of Supervisors* (1992) 7 Cal.App.4th 602, 612-613 [8 Cal.Rptr.2d 658].)" (25 Cal.App.4th at p. 1053.) ■ The legislative mandate of the Act is to facilitate disclosure

of all air pollution information other than trade secrets, which encompasses data used to calculate emission data. (*Id.* at pp. 1056-1057.) Delineation of emission factors as data used to calculate emission data is not, in our view, inconsistent with the legislative scheme and purpose, particularly where other public record information furnishes the essential rates of emissions, and emission factors are elsewhere given recognition as trade secrets. (Gov. Code, § 6254.7, subd. (d).)

Nor are we persuaded to deny trade secret status to emission factors by the additional requirement expressed in subdivision (h) of section 44346 and section 93321, subdivision (b) of the Regulations that data used to calculate emission data must appear *"in the facility diagram,"* a proviso which CHU suggests restricts the definition of trade secrets to "equipment used" and "inputs to" the production process. The definition of trade secrets is not so limited by the governing statutes and regulations. To the contrary, a facility diagram must contain information which reveals emission factors. Section 44342 generally provides that a facility diagram "shall include any nonpermitted and nonprocess sources of emissions and shall provide the necessary data to identify emission characteristics." The Regulations amplify upon the requirements of a facility diagram by indicating that average rates of emissions must be stated. (Regs., §§ 93311, 93321, 93340.)[7] Section 93321, subdivision (b) specifically declares that in the facility diagram, " 'necessary data to calculate emissions' shall include . . . emission factors." CHU's proposed interpretation of the governing statutes and regulations not only runs afoul of the plain meaning of the language, but also essentially eliminates the explicit omission of emission factors from the definition of public records.

CHU also argues that enjoining disclosure of emission factors will cause "immediate, grave, and irreparable harm" to the public by preventing evaluation of the health risks posed by pollution emissions, without furthering Masonite's interest in preventing a competitive disadvantage from disclosure of the information. The complaint of CHU is that the average rate of emissions is critical information under the Act which the public has an "overriding" interest in acquiring, as indicated in the declaration of research toxicologist Dr. William Pease, whereas production rates—indirectly revealed through access to emission factors—are of subordinate comparative significance to Masonite as a trade secret. This is particularly so, claims CHU, in light of Masonite's disclosure of some production data in the

---

[7] In the Regulations, under sections 93311 and 93321, estimates of emissions must be stated in the facility diagram, and section 93340 declares that calculation of emission estimates must be made from the "emission factor."

reports. Therefore, according to CHU, balancing the greater public harm caused by nondisclosure with the lesser interest served by protecting emission factors from release to Masonite's competitors precludes issuance of the injunction. (Cf. *Uribe* v. *Howie* (1971) 19 Cal.App.3d 194, 209-210 [96 Cal.Rptr. 493], hereafter *Uribe*.)[8]

■ We review the trial court's ruling upon the motion for preliminary injunction according to the standard we followed in *Masonite I*: " 'A determination to grant or deny a preliminary injunction requires the trial court to consider the likelihood that the plaintiff will prevail on the merits at trial and to weigh the interim harm to the plaintiff if the injunction is denied against the harm to the defendant if the injunction is granted. [Citation.] In such circumstance, the review on appeal is for abuse of discretion.' (*Department of Fish & Game* v. *Anderson-Cottonwood Irrigation Dist.* (1992) 8 Cal.App.4th 1554, 1560-1561 [11 Cal.Rptr.2d 222].)" (25 Cal.App.4th at p. 1050.)

■ Our balance of harm analysis is dictated by our determination that, as a matter of law, the trial court erred by denying Masonite trade secret protection for information designated as emission factors. We have concluded that Masonite, rather than CHU, will prevail on the issue of the classification of emission factors as trade secrets.[9] As to the weight to be accorded the competing interests of the parties, we are not inclined to deviate from the legislative pronouncements found in the Act, which favor granting trade secret status to emission factors over disclosure to the public. In contrast to the statutory trade secret privileges considered in *Uribe*, the exemptions from public disclosure afforded by the Act and Government Code section 6254.7 are absolute, and do not depend upon a further balancing of harm to the public. (Cf. *Uribe*, *supra*, 19 Cal.App.3d at p. 208.) Thus, we conclude that the trial court's failure to enjoin disclosure of emission factors was error.

---

[8]*Uribe* did not confront the issue of trade secret protection as specified in the Act and Government Code section 6254.7, but rather under distinct statutory law which did not provide for an "absolute privilege." (*Uribe*, *supra*, 19 Cal.App.3d at p. 206.) The court in *Uribe* recognized that Government Code section 6254.7 was not applicable to the case, and did not provide for a limited trade secret as did the statutes there under consideration. (*Uribe*, *supra*, 19 Cal.App.3d at p. 208.)

[9]We have not been presented with any factual dispute as to whether certain information has been properly categorized as emission factors, and apparently none exists.

II. *The Information Disclosed by Public Agencies to Environmental Organizations*

■ We next confront Masonite's claim that information denominated as trade secrets when presented in the reports, but thereafter inadvertently[10] disclosed to environmental organizations by the EPA and the OEHHA—the Category 3 and 4 information—is entitled to trade secret protection despite the disclosure. Masonite maintains that the disclosure by public agencies did not operate as a waiver of legitimate trade secret privileges or transform the information from trade secrets to public records. CHU argues that disclosure not only rendered the information public records rather than trade secrets under Government Code section 6254.7, subdivision (d) and section 93321, subdivision (b) of the Regulations, but also effectuated a waiver of Masonite's trade secret claims pursuant to Government Code section 6254.5.

The record reveals that the category 3 information, designated in reports as trade secret material by Masonite, was sent by the District to the OEHHA in July of 1993. In September of 1993, a representative of the Environmental Law Foundation requested "the opportunity to review" the reports, which, with the exception of trade secret information, are made available to the public. The OEHHA employee did not realize that the reports "contained information for which a claim of trade secret protection had been made" by Masonite, and so released the material for review in the office. If the OEHHA employee had known trade secret material was contained in the reports, he would not have unilaterally released it or been authorized to do so without permission from a supervisor.

The category 4 information was provided by the EPA, in response to a request, to "The Rural Institute" on September 27, 1993, which then sent copies of it to CHU. Included "inadvertently or by accident" in the category 4 information was "Exhibit 120," which contained "unredacted pages" of "confidential information." The EPA requested CHU to return the unredacted pages of exhibit 120 and not disclose the confidential information to any other party.

We conclude that the category 3 and 4 information, which had trade secret status when submitted to the District and EPA, did not become public records by virtue of mistaken disclosure to environmental organizations by public agencies. Based on the record before us, the provision in Government Code section 6254.7, subdivision (d), that trade secrets must be "known only

---

[10]The trial court's findings that the disclosures were inadvertent have not been challenged on appeal.

to certain individuals within a commercial concern" does not, in our view, operate to transmute the designated trade secrets into public records. We read this requirement to be applicable to the definition of trade secret at the time the information is submitted in the required reports, not upon occurrence of subsequent events beyond the control of the facility operator. Otherwise, the facility operator may be discouraged from completely and accurately reporting pollution data, a fundamental objective of the Act, by the prospect of the loss of protection afforded by law to privileged information through unauthorized disclosure to the public by the very agencies mandated by section 44346 to preserve the confidentiality of designated trade secrets. If information is "known only to certain individuals within a commercial concern" when first identified as privileged under section 44346, subdivision (a), it does not lose its character as a trade secret due to later inadvertent disclosure by a public agency. We do not equate limited, unsanctioned acquisition of confidential information by a third party, such as occurred here, with more general, authorized dissemination to the public or competitors which results in loss of trade secret privileges.[11] The public agencies which received the category 3 and 4 information were not entitled to distribute it further, so Masonite maintained the protection afforded by law to prevent disclosure of designated trade secrets to the general public and competitors. (Civ. Code, §§ 3426.1-3426.5.) We find that the category 3 and 4 information did not become a public record upon release by OEHHA and EPA.

For the same reasons we conclude that the exclusion of "information previously disclosed or easily discernible," from the definition in section 93321, subdivision (b) of the Regulations of " '[n]ecessary data to calculate emissions' which may be designated trade secret," does not defeat Masonite's claim of privilege for category 3 and 4 information. When the category 3 and 4 information was "designated trade secret" by Masonite, it was not yet "information previously disclosed or easily discernible" for purposes of section 93321, subdivision (b) of the Regulations. That it later became so through no fault of Masonite did not change the character of the information from a trade secret to a public record.

---

[11]Under the Uniform Trade Secrets Act, a trade secret is information that "[d]erives independent economic value, actual or potential, from not being *generally* known to the *public* or to other persons who can obtain economic value from its disclosure or use" and is "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (Civ. Code, § 3426.1, subd. (d), italics added.) Although we recognize that the trade secret definition in the Uniform Trade Secrets Act does not "supersede" the definition stated in Government Code section 6254.7 (Civ. Code, § 3426.7, subd. (a)), we find the former persuasive in interpreting the latter to mean that limited disclosure to noncompetitors does not result in loss of the trade secret privilege where, as with the category 3 and 4 information, the holder of the privilege made reasonable efforts to maintain secrecy.

Turning to CHU's claim of waiver, we direct our attention to Government Code section 6254.5, which provides in pertinent part: "Notwithstanding any other provisions of the law, whenever a state or local agency discloses a public record which is otherwise exempt from this chapter, to any member of the public, this disclosure shall constitute a waiver of the exemptions specified in Sections 6254, 6254.7, or other similar provisions of law. For purposes of this section, 'agency' includes a member, agent, officer, or employee of the agency acting within the scope of his or her membership, agency, office, or employment." Government Code section 6254.5 does not apply by its terms to the EPA, which is a federal rather than "state or local" agency, and we find that no waiver resulted from the OEHHA disclosure.

To constitute a waiver under Government Code section 6254.5, the employee or agent who made the disclosure must have acted "within the scope of his or her . . . agency, office or employment." The mistaken and inadvertent release of the Category 3 information by the OEHHA was, according to the undisputed evidence presented by Masonite, outside the proper scope of the employee's duties. Section 44346 delineates the accepted procedures for dissemination of trade secret information by a public agency. If information is properly designated as a trade secret by a facility operator under subdivision (b), it must be protected by the District. Release to the public is authorized by subdivision (c) only after the District furnishes the facility operator with written notification of a request for disclosure and the facility operator fails to obtain injunctive or declaratory relief "prohibiting disclosure" within 30 days thereafter.[12] The right to protect a previously designated trade secret is waived by failure of the facility operator, following notification, to challenge a request for release by timely judicial action, not by unauthorized disclosure by a public agency. For disclosure of a trade secret to fall within the scope of the "agency" or "employment" of the District for purposes of the waiver provisions of Government Code section 6254.5, compliance with the conditions specified in section 44346 must be demonstrated. Absent evidence that the District or the OEHHA adhered to the written notice and 30-day delay requirements of the statute prior to disclosure of the category 3 information, no waiver of trade secret protection may be found. We accordingly conclude that Masonite maintained a trade secret privilege for all category 3 and 4 information.

---

[12]Subdivision (c) of section 44346 reads in full: "(c) Upon receipt of a request for the release of information to the public which includes information which the operator has notified the district is a trade secret and which is not a public record, the following procedure applies: [¶] (1) The district shall notify the operator of the request in writing by certified mail, return receipt requested. [¶] (2) The district shall release the information to the public, but not earlier than 30 days after the date of mailing the notice of the request for information, unless, prior to the expiration of the 30-day period, the operator obtains an action in an appropriate court for a declaratory judgment that the information is subject to protection under this section or for a preliminary injunction prohibiting disclosure of the information to the public and promptly notifies the district of that action."

Having found that the category 3 and 4 information qualifies for trade secret protection, we follow our previous analysis in assessing the propriety of injunctive relief. In the absence of conflict in the evidence and considering our finding that the category 3 and 4 information is privileged, we must further find that Masonite has established a likelihood of prevailing on the merits. The legislative declaration that trade secrets which have not been waived are entitled to secrecy carries with it, we believe, a determination that the harm to the facility operator from release of confidential information outweighs the harm to the public from denying access to it. Thus, we conclude that the trial court erred by denying Masonite injunctive relief to preserve the secrecy of category 3 and 4 information.

## III. *The Information Disclosed in the Reports by Masonite*

We view differently the category 2 information, which consists of: items mistakenly not designated by Masonite as trade secrets in the reports filed in April and September of 1993, but only in subsequent revised, redacted reports and, items initially identified as trade secret information in one or more portions of the reports, but elsewhere voluntarily disclosed without trade secret designation. Masonite seeks to resurrect the trade secret privilege for the category 2 information.

As a threshold matter we dispose of CHU's challenge to our jurisdiction to undertake appellate review of the issue due to Masonite's failure to appeal from the ruling on the category 2 information on September 6, 1994. Masonite maintains, and we agree, that the trial court's order of September 6, 1994, was interim, and did not dispose of all of the issues presented by the motion for preliminary injunction. Thus, the interim order was not appealable, and did not commence the 60-day time limit of California Rules of Court, rule 2(a). (Code Civ. Proc., § 904.1; *Art Movers, Inc.* v. *Ni West, Inc.* (1992) 3 Cal.App.4th 640, 646-647 [4 Cal.Rptr.2d 689]; *Rao* v. *Campo* (1991) 233 Cal.App.3d 1557, 1564-1565 [285 Cal.Rptr. 691].) Masonite filed a timely appeal from the final judgment on the motion for preliminary injunction, which was dated June 1, 1995. The motion of CHU to strike the appeal in part is denied.[13]

Turning to the merits of the issue, the category 2 information was not properly designated as a trade secret by Masonite in the reports as specified in section 44346, subdivision (a). (*Masonite I, supra,* 25 Cal.App.4th at p. 1051.) Hence, the District was not compelled to protect the

---

[13]We also find, contrary to the protestations of CHU, that the record on appeal is adequate for our review of the issues presented by Masonite.

category 2 information from public disclosure (§ 44346, subds. (b) & (c)), and did not do so. Without proper designation as a trade secret, the category 2 information became a public record under section 93321, subdivision (b) of the Regulations, which provides that necessary data used to calculate emissions—the only information required in a facility diagram which may be classified as a trade secret (*Masonite I, supra,* 25 Cal.App.4th at pp. 1056-1057)—"shall not include information previously disclosed or easily discernible . . . ." Government Code section 6254.7, subdivision (d) further specifies that trade secrets must be "known only to certain individuals within a commercial concern . . . ." Once the category 2 information was revealed without trade secret designation, it became subject to public disclosure and was no longer privy only to those within the Masonite commercial concern.

For purposes of trade secret protection under the Act, we distinguish self-disclosure by the facility operator—the category 2 information—from unauthorized dissemination of information by a district or other public agency following proper designation as a trade secret—the category 3 and 4 information. Under the Act, the characterization of information as a trade secret or public record is determined when it is submitted by a facility operator to a district in a report. (§ 44346.) Just as trade secret status cannot be relinquished by the public agency once properly claimed, at least absent permission given by the facility operator, information that becomes a public record when submitted does not attain the status of a trade secret upon subsequent redaction. A trade secret must be initially so designated in the report to retain legal protection. (Gov. Code, § 6254.7, subd. (d); Regs., § 93321, subd. (b); *Masonite I, supra,* 25 Cal.App.4th at p. 1051.)

Our conclusion that only information designated in a report as a trade secret may be protected is reinforced by the provision in Government Code section 6254.5 for "waiver" of any exemptions from disclosure for material released to the public by a state or local agency. For the category 2 information—in contrast to the category 3 and 4 information—the release by the District was within the proper scope of authority to disclose public records. Consequently, under Government Code section 6254.5 a waiver of any privilege to protect the category 2 information as a trade secret occurred.[14] In summary: any item of information not properly designated in a report as a trade secret as mandated by section 44346, even if designated as a trade secret in other sections of the report, becomes a public record under section 93321, subdivision (b) of the Regulations and Government Code section 6254.7, subdivision (d) as material "previously disclosed" to other than those within a commercial concern; any trade secret privilege has also

---

[14]The category 3 and 4 information was, as we have noted, a designated trade secret which did not fall within the waiver provisions of Government Code section 6254.5 for "public records." The category 2 information was not designated as a trade secret, and so became a public record upon inclusion in the unredacted reports.

been waived pursuant to Government Code section 6254.5 upon authorized release to any member of the public, such as CHU.

We disagree with Masonite's position that only deliberate failure to designate information as a trade secret or disclosure to a "business concern's competitors" results in loss of trade secret protection under the Act. Inadvertent or mistaken disclosure, such as occurred here, which does not extend to "others in the industry," must still be protected, claims Masonite, to avoid an excessively punitive and "rigid rule." Masonite suggests that "absurd results" may follow unless factors such as the extent of actual disclosure and the reasons for failure to designate the information as a trade secret are considered in determining whether a trade secret has been preserved.

We find no absurdity in the statutory scheme of the Act which classifies information as a public record unless it is immediately designated as a trade secret in a report. Under California law, a trade secret exists as confidential material only when properly protected by the party seeking to assert the privilege. (*Morton* v. *Rank America, Inc.* (C.D.Cal. 1993) 812 F.Supp. 1062, 1075; *Vacco Industries, Inc.* v. *Van Den Berg* (1992) 5 Cal.App.4th 34, 50 [6 Cal.Rptr.2d 602].) "[I]t must, as the term implies, be kept secret by the one who creates it. [Citation.]" (*Ungar Electric Tools, Inc.* v. *Sid Ungar Co., Inc.* (1961) 192 Cal.App.2d 398, 403 [13 Cal.Rptr. 268].) Once the category 2 information was submitted in the reports without trade secret designation, whether deliberately or inadvertently, it was a public record which the District, and others, could disclose without restriction to the public generally. Lost was the essential character of the information as a trade secret.

We also find no contravention of the policies of the Act by requiring a facility operator such as Masonite to claim a trade secret in reports initially submitted to a district at the risk of forfeiture of trade secret protection. The facility operator is afforded the opportunity to properly claim a trade secret, and by doing so prevents disclosure of confidential information. (§ 44346.) Voluntary disclosure of information as a public record, even if mistaken, constitutes a valid waiver of trade secret protection. "Generally, 'waiver' denotes the voluntary relinquishment of a known right. But it can also mean the loss of an opportunity or a right as a result of a party's failure to perform an act it is required to perform, regardless of the party's intent to abandon or relinquish the right." (*Platt Pacific, Inc.* v. *Andelson* (1993) 6 Cal.4th 307, 315 [24 Cal.Rptr.2d 597, 862 P.2d 158]; *Berkeley Unified School Dist.* v. *State of California* (1995) 33 Cal.App.4th 350, 362 [39 Cal.Rptr.2d 326].) We accordingly conclude that the trial court did not err by denying Masonite's motion to enjoin the District from disclosing the category 2 information.

---

IV. *The Undertaking**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The trial court's denial of Masonite's motion for preliminary injunction to prevent disclosure of "emission factors" and category 3 and 4 information is reversed. In all other respects, the judgment is affirmed. The case is remanded to the trial court for further proceedings consistent with the views expressed herein. Our stay order shall remain in effect until the remittitur issues. The parties are to bear their own costs on appeal.

Stankman, P. J., and Dossee, J., concurred.

A petition for a rehearing was denied February 27, 1996.

---

*See footnote, *ante*, page 436.