Filed 4/9/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| AMGEN INC., | B296563 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 18STCP03147) |
| v. | |
| HEALTH CARE SERVICES, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles, Mitchell L. Beckloff, Judge. Reversed.

Xavier Becerra, Attorney General, Thomas S. Patterson, Assistant Attorney General, Paul Stein and Sharon L. O'Grady, Deputy Attorneys General, for Defendant and Appellant.

Hueston Hennigan, Moez M. Kaba and Lauren McGrory Johnson for Plaintiff and Respondent.

U.S. Chamber Litigation Center, Janet Galeria; Gibson, Dunn & Crutcher, Blaine H. Evanson and Shaun A. Mathur for Chamber of Commerce of the United States of America and National Association of Manufacturers as Amici Curiae on behalf of Plaintiff and Respondent.

Downey Brand, Annie S. Amaral; Arnold & Porter Kaye Scholer, Robert N. Weiner, Jeffrey L. Handwerker, and R. Stanton Jones for Pharmaceutical Research and Manufacturers of America as Amicus Curiae on behalf of Plaintiff and Respondent.

Shook, Hardy & Bacon, Amir M. Nassihi, Joan R. Camagong; GlaxoSmithKline and Marc Leonard Moore for GSK as Amicus Curiae on behalf of Plaintiff and Respondent.

Shook, Hardy & Bacon, Amir M. Nassihi, Joan R. Camagong for ViiV Healthcare as Amicus Curiae on behalf of Plaintiff and Respondent.

———————————————

Health and Safety Code section 127677, enacted as part of Senate Bill No. 17 (Stats. 2017, ch. 603, § 4), requires pharmaceutical manufacturers to provide 60-days' notice to public and private registered purchasers, including state entities and health insurers, before increasing the wholesale acquisition cost of a drug (we will refer to the notice as a "price increase notice"). That statutory section further mandates that registered purchasers who are pharmacy benefit managers give notice to certain of their customers irrespective of whether those customers are registered purchasers. Senate Bill No. 17 does not impose any confidentiality obligations on the recipients of the price increase notices or restrict their use of the information provided in the notices.

2

Plaintiff and respondent Amgen Inc. (Amgen) submitted a price increase notice by e-mail to defendant and appellant California Correctional Health Care Services (CCHCS) and the other approximately 170 registered purchasers.  When Reuters News made a request under the California Public Records Act (CPRA) (Gov. Code, § 6250 et seq.) seeking the price increase notices CCHCS had received, Amgen filed a petition for a writ of mandamus blocking disclosure, commonly called a "reverse-CPRA" action.  Amgen invoked the trade secret privilege under Evidence Code section 1060, incorporated into the CPRA through Government Code section 6254, subdivision (k).

Amgen also moved for a preliminary injunction, which the trial court granted.  CCHCS appeals from that order.

While this appeal was pending, the trial court sustained CCHCS's demurrer to the mandamus cause of action with leave to amend.  Amgen chose to dismiss its action instead.

On appeal, CCHCS argues the trial court abused its discretion when it found, among other things, that Amgen had made a sufficient showing that its price increase notice met the definition of a trade secret despite its disclosure to more than 170 registered purchasers and an unknown number of customers of pharmacy benefit managers.  CCHCS further contends the trial court erred in finding that the balance of hardships favored Amgen.  Amgen argues the appeal is moot following its dismissal of the underlying mandamus action, and that the trial court correctly ruled that limited disclosure of the price increase notice to noncompetitors did not deprive the information included in the price increase notice of its trade secret status.

We exercise our discretion to decide this otherwise moot appeal.  The issues this appeal raises are capable of repetition

3

because there will be future price increase notices. In addition, the issues are likely to evade review because a pharmaceutical manufacturer has little reason to continue to prosecute a mandamus action after obtaining a preliminary injunction for the 60-day period before a price increase becomes public.

On the merits, we agree with CCHCS. Amgen has failed to demonstrate that once it disclosed its price increase information pursuant to Senate Bill No. 17, that information retained whatever status it may previously have had as a trade secret. First, Amgen has failed to show that its disclosure was limited. Senate Bill No. 17 and Health and Safety Code section 127677 place no limitation on the registered purchasers' further dissemination of Amgen's price increases during the 60-day period, including to Amgen's competitors. Amgen provides no evidence that the registered purchasers have, or would, maintain the confidentiality of the price increase notice.

Second, Amgen has failed to explain why, even if the price increase information were not disseminated to competitors, the registered purchasers, who sit opposite Amgen at the bargaining table, are not themselves capable of taking economic advantage of that information, thus inflicting the very harm Amgen claims a preliminary injunction would prevent. Indeed, as detailed below, the purpose of Health and Safety Code section 127677 was to allow the registered purchasers actively to prepare for upcoming price increases by, inter alia, finding cheaper alternatives to the drugs subject to the notices.

Given Amgen's failure to show its price increase information was still a trade secret after disclosure to the registered purchasers, we further conclude that the trial court

4

abused its discretion in finding that the balance of harms favored Amgen.

Accordingly, we reverse the trial court's order granting the preliminary injunction.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Health and Safety Code section 127677

The Legislature passed Senate Bill No. 17 in 2017 to increase transparency into pharmaceutical pricing. The bill's author stated, "Expensive drugs and steady price increases are becoming commonplace with little transparency for astounding prices," and explained that Senate Bill No. 17 would "shin[e] a light on drugs that are having the greatest impact on our health care dollar." (Sen. Rules Com., Off. of Sen. Floor Analyses, Unfinished Business of Sen. Bill No. 17 (2017–2018 Reg. Sess.) as amended Sept. 5, 2017, p. 8.)

Among other things, Senate Bill No. 17 requires pharmaceutical manufacturers to provide advance notice of price increases to statutorily defined purchasers, including state purchasers and health insurers. (Health & Saf. Code, §§ 127675, 127677; Stats. 2017, ch. 603, § 4.) Supporters of the bill contended that providing them advance notice of price increases would allow them to "make changes to formularies; find alternatives to costly drugs; hold third-party purchasers accountable for prices and rebates; negotiate larger rebates and discounts; . . . prevent unnecessarily high payment for drugs, such as those with short-term price hikes where an alternative formulation can achieve the same result; and budget for price increases." (Assem. Com. on Appropriations, Analysis of Sen. Bill No. 17 (2017–2018 Reg. Sess.) as amended July 20, 2017, p. 4

[statement of San Francisco Culinary, Bartenders, and Service Employees Welfare Fund]; see also Sen. Health Com., Analysis of Sen. Bill No. 17 (2017–2018 Reg. Sess.) Mar. 14, 2017, p. 8 [bill cosponsor Health Access California stated that the advance notice provisions of bill would give purchasers "time to adjust formularies, to negotiate price concessions, and to seek other alternatives, including obtaining alternative formulations of drugs for which there are therapeutic equivalents"].)

Health and Safety Code section 127677 sets forth the advance notice provision of Senate Bill No. 17. It requires a prescription drug manufacturer to provide a minimum of 60 days' notice to specified recipients of an "increase in the wholesale acquisition cost of a prescription drug," subject to certain limitations not at issue in this appeal.[1] (Health & Saf. Code, § 127677, subds. (a), (b).) The notice "shall include" the date and amount of the increase, the current wholesale acquisition cost of the drug, "a statement regarding whether a change or improvement in the drug necessitates the price increase," and, if applicable, a description of that change or improvement. (*Id.*, subd. (c).)

The manufacturer must provide the notice to "each purchaser described in [Health and Safety Code] Section 127675" who "registers with the [Office of Statewide Health Planning and Development] for the purpose of this notification." (Health & Saf.

_____

[1] Notice is required only if the current wholesale acquisition cost of the drug is more than $40 for a course of therapy, and if the proposed increase "is more than 16 percent, including the proposed increase and the cumulative increases that occurred within the previous two calendar years prior to the current year." (Health & Saf. Code, § 127677, subd. (a).)

Code, § 127677, subds. (a), (d).)  The entities listed in Health and Safety Code section 127675 are considered "purchasers" for purposes of Health and Safety Code section 127677 because they either purchase drugs directly or because they provide reimbursement for prescription drug purchases by others.  (See Health & Saf. Code, § 127675, subd. (a) [applying chapter to manufacturers of prescription drugs that are "purchased or reimbursed" by the listed entities].)

Purchasers described in Health and Safety Code section 127675 include state purchasers like CCHCS, as well as "licensed health care service plan[s]," "health insurer[s] holding a valid outstanding certificate of authority from the Insurance Commissioner," and "pharmacy benefit manager[s]" as defined under Business and Professions Code section 4430, subdivision (j).[2]  (Health & Saf. Code, § 127675, subd. (a).) Pharmacy benefit managers in turn "shall notify [their] large contracting public and private purchasers of the increase"; a " 'large purchaser' " is defined as "a purchaser that provides coverage to more than 500 covered lives."  (*Id.*, § 127677, subd. (e).)

Neither Health and Safety Code section 127677 nor any other provision enacted under Senate Bill No. 17 requires the purchasers to keep the price increase notices confidential or otherwise restricts the purchasers' use of the information in the notices.

---

[2]  A pharmacy benefit manager "manages the prescription drug coverage" provided by entities such as health insurers and health care service plans.  (Bus. & Prof. Code, § 4430, subds. (a), (j).)

7

CCHCS provided the trial court with a list of approximately 170 individuals registered to receive the price increase notices.  The registered recipients represented over 70 public and private entities, such as the California Department of Public Health, the County of Los Angeles, CalPERS, Blue Shield, Kaiser Permanente, and CVS Health.[3]

## B.    Amgen's disclosure

On November 15, 2018, Amgen provided notice pursuant to Health and Safety Code section 127677 to all registered purchasers, including CCHCS.  The notice consisted of an e-mail and an attachment.  The e-mail, marked "Confidential" both in the subject line and at the beginning of the message text (some capitalization omitted), stated, "Amgen is providing the enclosed 60 day notification of potential list price actions for select drugs as required by California SB 17 to all registered purchasers.  In addition to the potential list price increases included in the attached notification, Amgen also intends to decrease list prices for select products in 2019."

The attachment consisted of a chart of 13 drugs, listing for each the earliest date of a price increase, the current wholesale acquisition cost, and a range of possible increases in both dollar amounts and percentages, with zero as the bottom of each range.[4]

---

[3] It appears from the list provided by CCHCS that multiple employees of a single entity have registered for receipt of the price increase notices.

[4] Amgen did not provide "a statement regarding whether a change or improvement in the drug necessitates the price increase."  (Health & Saf. Code, § 127677, subd. (c)(2).)  That omission is not at issue in this appeal.

On December 3, 2018, CCHCS informed Amgen by letter that it had received a CPRA request from Reuters News seeking all price increase notices received by CCHCS from November 1 to November 16, 2018. CCHCS stated, "Due to the confidentiality disclaimer set forth in [Amgen's] notification documents, CCHCS is providing this notice of its intent to disclose such records, in their entirety, in response to the PRA request." CCHCS stated it would disclose the notice unless it received a court order to the contrary by December 17, 2018. CCHCS stated that it "does not identify a legal basis for nondisclosure of the price increase notifications, as the records and its contents were provided pursuant to a statutory obligation . . . ."

On December 11, 2018, Amgen filed a complaint and petition for writ of mandate "seek[ing] declaratory and injunctive relief" to prevent CCHCS from disclosing its price increase notice. Amgen claimed its potential price increases constituted trade secrets privileged under Evidence Code section 1060, which exempted them from CPRA disclosure under Government Code section 6254, subdivision (k). Amgen did not challenge the validity of Senate Bill No. 17 or Health and Safety Code section 127677.

Amgen's writ petition was directed solely at protecting the confidentiality of the proposed price increases disclosed in the price increase notice; Amgen acknowledged in later filings that "[i]f Amgen in fact implements an increase in the [wholesale acquisition cost] for any particular product, that increase can be disclosed."

The trial court granted Amgen's unopposed ex parte application for a temporary restraining order. Amgen then moved for a preliminary injunction, which CCHCS opposed.

9

In support of its motion, Amgen submitted a declaration from an employee, Rachelle Wan (Wan). Wan declared that "Amgen invests substantial resources in developing its pricing strategy" and "spend[s] considerable time, effort, and money determining and properly calibrating Amgen's prices for its products, as well as making decisions about which products may see price changes and what possible changes may be implemented." According to Wan, "Amgen diligently protects the confidentiality" of its drug pricing strategy, including through employee training and limiting which employees have "access to information regarding drug prices and potential price changes." Wan attested that Amgen released the information to the registered purchasers "solely for the purpose of complying with" Health and Safety Code section 127677, and "would not otherwise disclose this information publicly."

Wan contended that public disclosure of Amgen's potential price changes would put it at a "significant competitive disadvantage by providing Amgen's competitors valuable non-public information and insights about Amgen's pricing strategy, internal decision-making, internal forecasts, and a roadmap for Amgen's potential actions with respect to certain of its products." Wan opined that a competitor armed with information about Amgen's potential future price increases could "(i) undercut Amgen's prices, (ii) 'dump' competing drugs onto the market in advance to decrease Amgen's sales, (iii) start a publicity campaign against Amgen's products, or (iv) negotiate sales contracts with potential clients and strengthen their existing client base," all to Amgen's detriment.

The trial court issued a written ruling in Amgen's favor on February 1, 2019. The trial court found that Amgen had

10

demonstrated a reasonable probability of prevailing on the merits of its writ petition. Citing Wan's declaration, the trial court found that Amgen had sufficiently demonstrated that the information in its price increase notice contained trade secrets. Specifically, the trial court found that Amgen had made reasonable efforts to maintain the secrecy of its potential price changes, and the pricing information had "independent economic value" in that Amgen "expended time, effort, and money" in setting the prices and its "pricing strategy provides [Amgen] with a competitive advantage over competitors."

The trial court rejected CCHCS's argument that disclosure of the pricing information to the registered purchasers vitiated any trade secret protection, because "the law compelled [Amgen] to make the disclosure," and "there is no evidence the pricing information in the Notice is 'generally known to the public' or [Amgen's] competitors." The trial court also rejected CCHCS's argument that the CPRA trade secret exemption under Government Code section 6254, subdivision (k) was permissive, not mandatory, finding that "without the ability to bring a reverse-CPRA action, [Amgen's] trade secret protection would be left to the discretion of [CCHCS]."

The trial court acknowledged that one of the goals of Senate Bill No. 17 was to " 'improve data transparency' " regarding drug pricing, but found this goal "is not thwarted through recognizing a manufacturer's trade secret information for up to 60 days before the price increase is effectuated."

Finally, the trial court found that "the balance of relative harms [in granting the injunction] tips in [Amgen's] favor." Despite Amgen's disclosure of the pricing information to the registered purchasers, "there is no evidence those purchasers

11

have not voluntarily complied with [Amgen's] request to maintain the confidentiality of the information," and "the audience to whom [Amgen] actually disclosed the pricing information was not [Amgen's] competitors.  Therefore, public dissemination of the pricing information could be harmful to [Amgen] notwithstanding [Amgen's] compliance with SB 17."

The trial court signed an order granting the preliminary injunction on March 11, 2019, stating that "Amgen's Notice or information contained in Amgen's Notice shall not be disclosed by CCHCS to any third parties pursuant to a Public Records Act request or otherwise."[5]  (Footnote omitted.)  The order further stated that "[n]othing in this Order shall prevent CCHCS from disclosing a price increase to the Wholesale Acquisition Cost (WAC) implemented by Amgen for the medications in the Notice."

CCHCS timely appealed from the grant of the preliminary injunction.  Amgen applied ex parte to stay the trial court proceedings pending resolution of the appeal, which CCHCS opposed.  The trial court denied the ex parte application.

The trial court subsequently sustained CCHCS's demurrer to the mandamus cause of action with leave to amend.[6]  Amgen

_____

[5]  CCHCS objected in the trial court to the "or otherwise" language in the preliminary injunction order, which arguably bars any public disclosure, and not just disclosure pursuant to a CPRA request.  CCHCS does not renew this challenge on appeal; we therefore do not address the validity or effect on this appeal of the "or otherwise" language.

[6]  The trial court also stayed Amgen's cause of action for declaratory relief and sustained the demurrer without leave to amend to the cause of action for injunctive relief.  The trial court's rulings on the demurrer are not at issue in this appeal.

12

did not amend, instead voluntarily dismissing its action, thereby abandoning its attempt to prevent CCHCS from providing the price increase notification to Reuters News. Amgen represents on appeal that the dismissal did not "jeopardize[e] its trade secrets because it had already implemented the proposed price changes for the drugs listed in the SB 17 notice."

## DISCUSSION

## I. This Appeal Is Not Barred by the Mootness Doctrine

As an initial matter, Amgen argues that its voluntary dismissal of the underlying action dissolved the preliminary injunction CCHCS seeks to challenge, and thus the appeal should be dismissed as moot. As CCHCS notes, however, we "retain[ ] discretion to decide a moot issue if the case presents an issue of ' "substantial and continuing public interest" ' and is capable of repetition yet evades review." (*Citizens Oversight, Inc. v. Vu* (2019) 35 Cal.App.5th 612, 615; *Conservatorship of Wendland* (2001) 26 Cal.4th 519, 524, fn. 1.)

This is such a case. The issues involved are capable of repetition. We reasonably can expect that Amgen will provide price increase notices in the future, and will again attempt to enjoin disclosure of those notices under the CPRA. Indeed, at the hearing on CCHCS's demurrer, Amgen's counsel admitted, "[W]e're going to have the same issue the next time a disclosure is made and if a C.P.R.A. request is made for that information." Counsel continued, "So it becomes a repeated issue."

The issues raised by this case are not limited to the parties before us. Amici curiae GlaxoSmithKline LLC and ViiV Healthcare US state that they "have each been notified by state agencies on three separate occasions that third parties were

13

seeking disclosure of the advance price increase submissions," and both have taken legal action to prevent the public agencies from disclosing the submissions.

Amgen suggests the dispute at issue in this case is unlikely to recur because the contents of Amgen's future price increase notices may change—for example, Amgen may no longer include a range of possible price increases, instead listing only a specific increase—which in turn may affect the trade secret analysis. Because our resolution of this appeal does not turn on the contents of Amgen's notice, we reject this argument.

The issues in this case also are likely to evade review. As Amgen has made clear, its goal in this litigation was to prevent disclosure of its proposed price increases for the 60-day period before Amgen implemented the new prices. Once Amgen implemented the price increases, it could (and did) dismiss its reverse-CPRA action without jeopardizing its purported trade secrets. Nothing prevents Amgen from taking a similar approach to future price increase notices, in which case the trial and appellate courts would never reach the merits of the case.[7]

We further conclude that the interrelation of trade secret protections and Health and Safety Code section 127677 is an issue of substantial and continuing public interest, given the

---

[7] Amgen represents that it dismissed the underlying case not to avoid a ruling on the merits, but out of concern that changes in the content of its future notices might render any declaratory relief based on its current notice of limited use. We do not question Amgen's motives. We merely note that a pharmaceutical manufacturer has little incentive to continue prosecuting an action to protect its price increase notice once it has implemented the price increases publicly.

14

multiple legal actions taken by drug manufacturers to prevent disclosure of their price increase notices, the filing of three briefs by amici curiae in this case, and the fact that the disclosure in the case was sought by a prominent news organization.

Amgen argues that CCHCS "cannot invoke the discretionary exception to mootness because it voluntarily chose not to preserve the status quo pending this appeal" when it opposed Amgen's request to stay the trial court proceedings. Amgen cites *Fair v. United States E.P.A.* (9th Cir. 1986) 795 F.2d 851 (*Fair*), which declined to consider a moot appeal when it was "unlikely that this controversy will arise again between these parties," and "[t]he sole reason this case 'evaded review' is the appellants' failure to take requisite action," such as posting a bond along with their request for a preliminary injunction or seeking a stay of the trial court's judgment pending appeal. (*Id.* at p. 855.)

*Fair* is inapposite. As set forth above, the controversy at issue in this case is likely to arise again between these parties, and the appeal was rendered moot not through CCHCS's inaction, but by Amgen's decision to dismiss the underlying case, something CCHCS could not have prevented even had it agreed to stay the proceedings in the trial court.

Amgen's other cited cases do not support the proposition that application of the mootness exception depends on the appellant taking action to preserve the status quo. Instead, the courts in those cases declined to apply the exception because they were not persuaded the issues in the cases were likely to recur. (See *Building a Better Redondo, Inc. v. City of Redondo Beach* (2012) 203 Cal.App.4th 852, 867 [no exception to mootness applied because "the appeal of the judgment in this case presents

15

fact-specific issues that are unlikely to recur"]; *Santa Monica Baykeeper v. City of Malibu* (2011) 193 Cal.App.4th 1538, 1551 [declining to apply an "exception for recurring controversies" to an otherwise moot appeal because the recurrence of issues concerning a particular construction project in future undefined projects was speculative].)  Amgen also cites *Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, but that case did not address any exceptions to the mootness doctrine.

We proceed to the merits of CCHCS's appeal.

## II.     The Trial Court Abused Its Discretion by Granting the Preliminary Injunction

CCHCS raises several contentions on appeal.  Two are dispositive.  We agree that the trial court abused its discretion when it concluded that (1) Amgen had sufficiently shown its price increase notice is a trade secret despite its disclosure to the registered purchasers, and (2) Amgen sufficiently demonstrated it would be harmed if CCHCS disclosed Amgen's price increase notice to Reuters News and other members of the public during the 60-day notice period under Health and Safety Code section 127677.  We assume without deciding that the price increase information was a trade secret before Amgen disclosed it to the purchasers.

### A.     Standard of review

"[A] preliminary injunction is an order that is sought by a plaintiff prior to a full adjudication of the merits of its claim." (*White v. Davis* (2003) 30 Cal.4th 528, 554, italics omitted.)  "To obtain a preliminary injunction, a plaintiff ordinarily is required to present evidence of the irreparable injury or interim harm that

16

it will suffer if an injunction is not issued pending an adjudication of the merits." (*Ibid.*)

Trial courts " 'evaluate two interrelated factors when deciding whether or not to issue a preliminary injunction. The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued.' " (*ITV Gurney Holding Inc. v. Gurney* (2017) 18 Cal.App.5th 22, 28–29 (*ITV Gurney*).)

"We review a trial court's application of these factors for abuse of discretion." (*ITV Gurney*, *supra*, 18 Cal.App.5th at p. 29.) "However, if the 'likelihood of prevailing on the merits' factor depends upon the construction of a statute or another question of law, rather than evidence to be introduced at trial, our review of that issue is independent or de novo." (*Marken v. Santa Monica-Malibu School Dist.* (2012) 202 Cal.App.4th 1250, 1261 (*Marken*).)

## B.    The California Public Records Act

Under the CPRA, "every person has a right to inspect any public record" except records that are "exempt from disclosure by express provisions of law." (Gov. Code, § 6253, subds. (a), (b).) " 'In other words, all public records are subject to disclosure unless the Legislature has expressly provided to the contrary.' " (*American Civil Liberties Union Foundation v. Superior Court* (2017) 3 Cal.5th 1032, 1038–1039.) " 'Public records' includes any writing containing information relating to the conduct of the public's business prepared, owned, used, or retained by any state or local agency . . . ." (Gov. Code, § 6252, subd. (e).) The parties

do not dispute that the price increase notice that Amgen sent to CCHCS is a public record.[8]

Although the CPRA provides a mechanism to challenge an agency's refusal to disclose a requested public record (see Gov. Code, § 6258), it provides no mechanism for a third party to *prevent* a public agency from disclosing public records. (*Marken*, *supra*, 202 Cal.App.4th at p. 1267.) "Therefore, third parties must bring an independent action for declaratory relief or traditional mandamus if they believe they will be adversely affected by disclosure." (*Pasadena Police Officers Assn. v. City of Pasadena* (2018) 22 Cal.App.5th 147, 160, fn. 16.) This type of mandamus action is commonly called a "reverse-CPRA action." (*National Conference of Black Mayors v. Chico Community Publishing, Inc.* (2018) 25 Cal.App.5th 570, 575, fn. 2.)

Here, Amgen bases its reverse-CPRA action on Government Code section 6254, which lists over two dozen categories of documents exempt from disclosure under the CPRA. Amgen claims its price increase notice is exempt from disclosure under subdivision (k) of that section, which exempts "[r]ecords, the disclosure of which is exempted or prohibited pursuant to federal or state law, including, but not limited to, provisions of the Evidence Code relating to privilege." Amgen contends that subdivision (k) incorporates the trade secret privilege under

---

[8] Amici curiae GlaxoSmithKline LLC and ViiV Healthcare US argue that Amgen's notice is not a public record. Because the parties have not raised this argument, we decline to address it. (*Bullock v. Philip Morris USA, Inc.* (2011) 198 Cal.App.4th 543, 572 ["An amicus curiae ordinarily must limit its argument to the issues raised by the parties on appeal, and a reviewing court need not address additional arguments raised by an amicus curiae"].)

Evidence Code section 1060, which provides that "the owner of a trade secret has a privilege to refuse to disclose the secret, and to prevent another from disclosing it, if the allowance of the privilege will not tend to conceal fraud or otherwise work injustice."

The exemptions in Government Code section 6254 "are permissive, not mandatory: They allow nondisclosure but do not prohibit disclosure." (*Marken*, *supra*, 202 Cal.App.4th at p. 1262; see Gov. Code, § 6254, 2d to last para. ["This section does not prevent any agency from opening its records concerning the administration of the agency to public inspection, unless disclosure is otherwise prohibited by law"].)  In other words, a government agency has the discretion to invoke an exemption under Government Code section 6254, but is not required to do so.  Because mandamus cannot be used " 'to control an exercise of discretion' "(*Marken*, at p. 1266), a party bringing a reverse-CPRA action must show disclosure is " 'otherwise prohibited by law,' " that is, that the government agency *lacks* discretion to disclose.  (*Id*. at p. 1270, quoting Gov. Code, § 6254, 2d to last par.)  Parties have brought reverse-CPRA actions, for example, based on the state constitutional right to privacy (*Marken*, at p. 1271) and the requirement under Penal Code section 832.7, subdivision (a) that peace officer personnel records remain confidential.  (*Pasadena Police Officers Assn. v. Superior Court* (2015) 240 Cal.App.4th 268, 285 (*Pasadena Police*).)

It is not clear to us that the trade secret evidentiary privilege is a broad prohibition on disclosure akin to the constitutional right to privacy or the statutory protection for peace officer personnel records.  Evidentiary privileges as a general matter apply in a " '[p]roceeding,' " defined in the

Evidence Code as "any action, hearing, investigation, inquest, or inquiry (whether conducted by a court, administrative agency, hearing officer, arbitrator, legislative body, or any other person authorized by law) in which, pursuant to law, testimony can be compelled to be given."  (Evid. Code, § 901; see also *id.*, § 910 [Evidence Code privileges "apply in all proceedings"].)  We are not aware of any authority holding that the trade secret evidentiary privilege bars the government from disclosing information outside of the context of a "proceeding," nor has Amgen directed us to any such authority.

Although the Legislature expanded the reach of the evidentiary privileges by incorporating them into the CPRA as exemptions, those exemptions, like all exemptions under Government Code section 6254, are not mandatory.  Thus, while incorporation of the evidentiary privileges into the CPRA grants the government additional discretionary bases to refuse disclosure, it does not necessarily follow that the Legislature intended to allow third parties to assert those privileges outside the context of a "proceeding" to prohibit the government from disclosing information subject to those privileges.

In light of the above, it is not a foregone conclusion that the trade secret privilege under Evidence Code section 1060 is a proper basis for a reverse-CPRA mandamus action.  Given our holding in Part C of our Discussion, *post*, that Amgen has failed to show its price increase notice was a trade secret after it had been disclosed pursuant to Senate Bill No. 17, however, we need not decide the question.

### C. Amgen has failed to show a probability of success on the merits

CCHCS contends the trial court abused its discretion by concluding that Amgen had sufficiently shown that its price increase notice was a trade secret despite its disclosure to the registered purchasers.  We agree.

" '[W]hether information constitutes a trade secret is a question of fact.' " (*Global Protein Products, Inc. v. Le* (2019) 42 Cal.App.5th 352, 367.)  The party claiming the trade secret privilege under Evidence Code section 1060 bears the burden of proving its entitlement to that privilege.  (*Bridgestone/Firestone, Inc. v. Superior Court* (1992) 7 Cal.App.4th 1384, 1393.) Similarly, a party resisting disclosure under the CPRA bears the burden of proving an exemption applies.  (*Pasadena Police*, *supra*, 240 Cal.App.4th at p. 290.)  In this case, the record does not support the trial court's finding that Amgen had met its burden.

In applying Evidence Code section 1060 and Government Code section 6254, subdivision (k), the trial court used the trade secret definition from Civil Code section 3426.1, subdivision (d), which is part of the Uniform Trade Secrets Act (UTSA) (Civ. Code, § 3426 et seq.).  This was appropriate; the Evidence Code and case law apply the UTSA definition to the trade secret privilege under Evidence Code section 1060.  (Evid. Code, § 1061, subd. (a)(1); *Stadish v. Superior Court* (1999) 71 Cal.App.4th 1130, 1141 & fn. 10.)

Civil Code section 3426.1, subdivision (d) defines a trade secret as "information . . . that:  [¶]  (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and [¶]  (2) Is the subject of

21

efforts that are reasonable under the circumstances to maintain its secrecy." "In short, the test for a trade secret is whether the matter sought to be protected is information (1) that is valuable because it is unknown to others and (2) that the owner has attempted to keep secret." (*DVD Copy Control Assn., Inc. v. Bunner* (2004) 116 Cal.App.4th 241, 251 (*DVD Copy*).)

Our focus here is on the first prong,[9] which recognizes the self-evident principle that a trade secret must, in fact, be secret. (See 1 Milgrim on Trade Secrets (2009) § 1.03 ["Indispensable to an effective allegation of a trade secret is proof that the matter is, more or less, secret. In the absence of secrecy the property disappears"].) This is because the "intrinsic value" of a trade secret "is based upon, or at least preserved by, being safeguarded from disclosure." (*Pillsbury, Madison & Sutro v. Schectman* (1997) 55 Cal.App.4th 1279, 1287; see also *DVD Copy Control Assn., Inc. v. Bunner* (2003) 31 Cal.4th 864, 881 [" 'Trade secrets

_____

[9] Had Amgen voluntarily disclosed its purported trade secrets to the registered purchasers, Amgen likely would fail to satisfy the second prong of the trade secret definition because it would not have made reasonable efforts to maintain secrecy. (See, e.g., *Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1454–1455 [manufacturer did not make reasonable efforts to maintain secrecy of information disclosed to customer without a secrecy agreement in place].) The trial court ruled, however, that Amgen's disclosure in this case was "compelled" by the requirements of Health and Safety Code section 127677, the implication being that Amgen did everything it reasonably could to maintain secrecy short of violating the law. Because we conclude that Amgen has failed to make a sufficient showing to satisfy the first prong, we do not decide whether Amgen's disclosure was "compelled" or what impact, if any, such a finding might have on the second prong of the trade secret definition.

22

are a peculiar kind of property. Their only value consists in their being kept private' "].)

Thus, "[p]ublic disclosure, that is the absence of secrecy, is fatal to the existence of a trade secret. 'If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished.' " (*In re Providian Credit Card Cases* (2002) 96 Cal.App.4th 292, 304 (*Providian Credit Card*), quoting *Ruckelshaus v. Monsanto Co.* (1984) 467 U.S. 986, 1002.) In *Providian Credit Card*, for example, the court held that telemarketing scripts are not trade secrets once they are read to customers. (*Providian Credit Card*, at p. 305.)

Amgen does not dispute that it disclosed its price increase notice to over 170 registered purchasers. The disclosure did not stop there, because those registered purchasers who were pharmacy benefit managers were required by statute also to inform their "large contracting public and private purchasers," whether or not those contracting purchasers themselves were registered.[10] (Health & Saf. Code, § 127677, subd. (e).)

Amgen provided no evidence that the recipients of the price increase information, whether registered purchasers or purchasers contracting with pharmacy benefit managers, were

---

[10] Senate Bill No. 17 itself contains no limitation on the number of purchasers entitled to receive the price increase notice, so long as they either meet the statutory definition and register, or are "large" purchasers that are contracting with a pharmacy benefit manager that is registered. As noted earlier, "large" purchasers are those that "provide[ ] coverage to more than 500 covered lives." (Health & Saf. Code, § 127677, subd. (e).)

under any contractual obligation to maintain its confidentiality, nor does Senate Bill No. 17 impose any confidentiality obligations.[11]  In contrast, other provisions of Senate Bill No. 17 expressly impose confidentially requirements for certain information disclosed to the government.  For example, Health and Safety Code section 1367.243 (Stats. 2017, ch. 603, § 1), which requires health care service plans annually to report information regarding pharmaceuticals dispensed under the plans (*id.*, subd. (a)(2)), states that "the department shall keep confidential all of the information provided to the department pursuant to this section, and the information shall be protected from public disclosure." (*Id.*, subd. (f).)  No such language pertaining to the price increase notices appears in Senate Bill No. 17.

Given the price increase notice's disclosure to an unknown number of recipients, none of whom was bound to keep it in confidence, it would not appear that Amgen's price increase notice could be called "secret."

The trial court found to the contrary, relying on the proposition that disclosed information nonetheless may retain trade secret status so long as it is not "generally known to the public or to other persons who can obtain economic value from its disclosure or use." (Civ. Code, § 3426.1, subd. (d)(1); see *Masonite Corp. v. County of Mendocino Air Quality Management Dist.* (1996) 42 Cal.App.4th 436, 451, fn. 11 (*Masonite*) ["limited

---

[11]  At the hearing on Amgen's preliminary injunction motion, Amgen's counsel suggested Amgen has "confidentiality expectations and obligations" with its purchasers, but Amgen has not identified any evidence in the record supporting this contention.

24

disclosure to noncompetitors does not result in loss of the trade secret privilege where . . . the holder of the privilege made reasonable efforts to maintain secrecy"].)

The trial court found "no evidence the pricing information in the Notice is 'generally known to the public' or [Amgen's] competitors." The trial court further noted "there is no evidence those purchasers have not voluntarily complied with [Amgen's] request to maintain the confidentiality of the information," presumably referring to Amgen's placing the term "Confidential" in both the subject line and text of the e-mail transmitting the price increase notification.

In so concluding, the trial court misapplied the burden of proof and abused its discretion. As the authorities cited above indicate, disclosure to others, who have no obligation to maintain confidentiality, will destroy a trade secret. As the party asserting the trade secret privilege, it was Amgen's burden to establish that its price increase notice remained confidential despite disclosure to the registered purchasers and "large" customers of pharmacy benefit managers. At a minimum, this would have required some evidence that the purchasers did not, and would not, disclose the information to the general public or to those "who can obtain economic value from its disclosure or use." (Civ. Code, § 3426.1, subd. (d)(1).) Amgen presented no evidence on this issue. The trial court instead relied on a purported *lack* of evidence of further disclosure, thus improperly shifting the burden of proof to CCHCS.

Amgen argues that at the preliminary injunction stage, it need only show " 'a reasonable probability' that it would prevail on the merits." This is so, but in the absence of any evidence whatsoever that Amgen's price increase notice maintained its

confidentiality after disclosure to the registered purchasers and others, the trial court had no basis to find Amgen had a probability of prevailing on that critical issue, much less a reasonable one.

The trial court's finding that Amgen's disclosure was "compelled" does not affect our conclusion. The question here is not why Amgen disclosed its price increase notice, but whether that disclosure rendered the notice no longer confidential.

Even assuming arguendo that the registered purchasers did not disseminate the price increase notice further, we would conclude that Amgen has failed to show that the notice maintained its purported trade secret status. Amgen has not explained why the registered purchasers, who directly or indirectly sit on the opposite side of the negotiating table from Amgen, are not themselves "persons who can obtain economic value" from advance knowledge of Amgen's prospective pricing information. (Civ. Code, § 3426.1, subd. (d)(1).) To paraphrase Amgen's declarant Wan, a large purchaser negotiating deals for Amgen's and its competitors' products presumably would greatly value insight into Amgen's "pricing strategy, internal decision-making, internal forecasts," and "roadmap[s] for Amgen's potential actions." Thus, whatever benefit Amgen may have derived from keeping secret its future price increases would have been lost once those increases were disclosed to the purchasers, even if the purchasers used the information solely for their own purposes without disclosing it further.

Among other things, purchasers aware of upcoming price increases can seek less expensive alternatives from Amgen's competitors, to the purchasers' economic benefit and Amgen's detriment. Indeed, the legislative history of Senate Bill No. 17

26

indicates that this was precisely what the Legislature intended to happen. (See Sen. Health Com., Analysis of Sen. Bill No. 17 (2017–2018 Reg. Sess.) Mar. 14, 2017, p. 8 [advance notice provision "gives purchasers . . . time . . . to seek other alternatives, including obtaining alternative formulations of drugs for which there are therapeutic equivalents"]; Assem. Com. on Appropriations, Analysis of Sen. Bill No. 17 (2017–2018 Reg. Sess.) as amended July 20, 2017, p. 4 ["the advance price notification will help [the purchaser] . . . find alternatives to costly drugs . . . and prevent unnecessarily high payment for drugs, such as those with short-term price hikes where an alternative formulation can achieve the same result"].)

In short, Amgen has failed to explain how its purported trade secret maintained its confidentiality and concomitant value to Amgen when it was disclosed to over 170 purchasers who had the incentive to use the information to their benefit and Amgen's detriment, and were not subject to any restrictions on using or further disseminating the information.

Amgen's cited cases, some of which the trial court relied upon as well, are unavailing. We discuss each in turn.

*Masonite*, *supra*, 42 Cal.App.4th 436 held that air emissions information submitted to government regulators did not lose trade secret protection when those regulators, who were statutorily bound to maintain the confidentiality of the information, inadvertently disclosed the information to two environmental organizations.[12] (*Id.* at pp. 450–451.) Thus,

---

[12] Masonite claimed trade secret status under statutes specific to air emissions information submitted to regulators, none of which is applicable to this case. (See Gov. Code, § 6254.7;

27

despite the disclosure, the trade secret holder could prevent another environmental organization from obtaining the information through a public records request. (*Id.* at pp. 451, 456.)

The *Masonite* court reasoned, "We do not equate limited, unsanctioned acquisition of confidential information by a third party, such as occurred here, with more general, authorized dissemination to the public or competitors which results in loss of trade secret privileges. The public agencies which received the . . . information were not entitled to distribute it further, so Masonite maintained the protection afforded by law to prevent disclosure of designated trade secrets to the general public and competitors." (*Masonite*, *supra*, 42 Cal.App.4th at p. 451, fn. omitted.) Although not applicable in that case, the *Masonite* court found the trade secret definition in Civil Code section 3426.1, subdivision (d), the definition at issue in the instant case, supports the proposition that "limited disclosure to noncompetitors does not result in loss of the trade secret privilege where . . . the holder of the privilege made reasonable efforts to maintain secrecy." (*Masonite*, at p. 451, fn. 11.) It is for this proposition that Amgen cites *Masonite*.

The government's inadvertent disclosure in *Masonite* is not analogous to Amgen's disclosure under Senate Bill No. 17. *Masonite* stands for the proposition that the government's erroneous disclosure of information that it is statutorily bound to keep confidential does not convert the information into a public

---

Health & Saf. Code, § 44346; *Masonite*, *supra*, 42 Cal.App.4th at pp. 450–451.)

28

record, at least when the inadvertent disclosure is "limited" and made to "noncompetitors."

Here, Amgen, not the government, disclosed the price increase notice to the registered purchasers. Amgen did so in compliance with a statutory regime that, far from protecting Amgen's price information, required that it be disclosed to a long list of potentially adverse recipients with no limitations on those recipients' use or further dissemination of the information. Amgen cannot claim to have been unaware of the possible consequences of its disclosure, including the loss of trade secret protections; trade groups opposed Senate Bill No. 17 precisely because it "requires the disclosure of commercially sensitive pricing information" "without confidentiality protections." (Assem. Com. on Appropriations, Analysis of Sen. Bill No. 17 (2017–2018 Reg. Sess.) as amended July 20, 2017, p. 4 [summarizing joint letter of Pharmaceutical Research and Manufacturers of America, Biotechnology Innovation Organization, California Life Sciences Association, and Biocom].)

Also, as we have explained, Amgen has failed to make any showing that the registered purchasers were not akin to competitors who could derive economic value from Amgen's pricing information, or that the purchasers would not further disseminate Amgen's price increase notice. Indeed, the pharmacy benefit managers were required to disseminate it further to their "large" contracting purchasers. Thus, to the extent information may remain a trade secret despite "limited disclosure to noncompetitors," such as the small number of environmental organizations in *Masonite*, Amgen has not shown that principle applies here.

Amgen also quotes *DVD Copy*, *supra*, 116 Cal.App.4th 241, which stated, "Publication on the Internet does not necessarily destroy the secret if the publication is sufficiently obscure or transient or otherwise limited so that it does not become generally known to the relevant people, i.e., potential competitors or other persons to whom the information would have some economic value." (*Id.* at p. 251.) *DVD Copy* does not in fact apply this principle, concluding instead that the evidence indicated the Internet disclosure in that case likely reached millions of people. (*Id.* at p. 252.) Thus, *DVD Copy* gives no guidance as to what it means for a publication to be "sufficiently obscure or transient or otherwise limited" that it does not destroy trade secret protections. Also, as we have explained, Amgen has failed to show that the registered purchasers were not "other persons to whom the information would have some economic value." (*Id.* at p. 251.) *DVD Copy* therefore does not undercut our conclusion that Amgen has failed to show that its price increase notice remained a trade secret after disclosure to the registered purchasers.

Amgen cites *American Defense Systems, Inc. v. Southern California Gold Products, Inc.* (C.D. Cal. May 14, 2009, No. CV 07-7134) 2009 WL 10671854, at page *3 for the proposition that "limited disclosure for [a] specified purpose 'cannot be considered tantamount to placing plaintiff's trade secrets in the public domain.' " In that case, however, the trade secret holder had a contract with the federal government "which explicitly prevent[ed] general or public disclosure of trade secrets." (*Ibid.*) Thus, the trade secret holder providing its products to the government under the terms of that contract did

not vitiate its trade secret protections.  (*Ibid.*)  Amgen has demonstrated no such obligation of confidentiality here.

Amgen cites *Morlife, Inc. v. Perry* (1997) 56 Cal.App.4th 1514, 1522 (*Morlife*) for the proposition that information that is " 'not readily ascertainable, but only discoverable with great effort' " can be a trade secret.  *Morlife* did not concern the legal effect of the disclosure of trade secrets; instead, it addressed whether the information in a roofing company's customer list was " 'readily ascertainable' through public sources" such that it could not constitute a trade secret in the first place.  (*Id.* at pp. 1521–1522.)  Assuming arguendo that principle applies here, it is of no help to Amgen.  Even if Amgen's price increase notice were not readily ascertainable by the general public (although Amgen provided no evidence of this), it was certainly ascertainable by the purchasers who received the notice without any limitation on using that information to their economic advantage.

Amgen contends in its supplemental briefing and emphasized at oral argument that recipients of the price increase notice did in fact have "a duty to maintain the secrecy and limit use of Amgen's trade secrets" under the trade secret misappropriation statutes.  (See Civ. Code, § 3426.1, subd. (b)(2)(A)(ii) [misappropriation includes "[d]isclosure or use of a trade secret" when the trade secret was "[a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use"].)  Amgen argues that CCHCS "recognized this duty" when it sent Amgen the letter informing Amgen of Reuters News's CPRA request.  Amgen further argues that Senate Bill No. 17 "contemplates that CCHCS will use price increase notifications for only a specific, limited purpose," namely to

31

" 'understand and plan for specific price increases.' " (Quoting Assem. Com. on Appropriations, Analysis of Sen. Bill No. 17 (2017–2018 Reg. Sess.) as amended July 20, 2017, p. 3.)

As we have discussed, nothing in Senate Bill No. 17 requires purchasers to maintain the confidentiality of price increase notices. The fact that CCHCS, in light of Amgen's unilaterally marking its price increase notice confidential, notified Amgen before responding to the CPRA request, does not establish that CCHCS was obligated to do so. It is telling that in that same letter, CCHCS stated that it had "not identif[ied] a legal basis for nondisclosure," and intended to disclose the price increase notice absent a court order. CCHCS's letter cannot be read to concede any confidentiality obligation. Even if it could, we would not be bound by any such concession given the absence of any supporting language in Senate Bill No. 17.

Furthermore, there is no language in Senate Bill No. 17 limiting the purposes for which recipients may use the price increase notice. Indeed, reading limitations into the statutory scheme would be inimical to its purpose, given that one of the intended goals of Senate Bill No. 17 was to allow the purchasers to find less expensive alternatives for the drugs listed in the price increase notices. This would include use of the information in the price increase notice in negotiations to accomplish that goal, including negotiations between purchasers and Amgen's competitors.

Amgen cites federal cases in support of its misappropriation argument. All these cases are inapposite, because they involve confidentiality obligations arising from agreements or express statutory mandates. (See *Jerome Stevens Pharmaceut. v. Food & Drug. Admin.* (D.C. Cir. 2005) 402 F.3d

32

1249, 1252 [federal law prohibited disclosure of trade secrets at issue]; *Kramer v. Secretary, United States Dept. of Army* (2d. Cir. 1980) 653 F.2d 726, 730 [plaintiff alleged "government employees agreed to honor her demand that the information, once disclosed [in an effort to obtain a government contract], be treated in confidence"]; *Inteliclear, LLC v. ETC Global Holdings* (C.D. Cal. Apr. 5, 2019, No. 2:18-cv-10342) 2019 WL 3000648, at p. *3 [under license agreement, "Defendant had a duty to maintain in confidence Plaintiff's intellectual property"]; *BladeRoom Group Ltd. v. Emerson Elec. Co.* (N.D. Cal. 2018) 331 F.Supp.3d 977, 984 [defendant's written agreement to use plaintiff's information " 'only for the purpose of internal evaluation of whether to enter into a business relationship' " gave " 'rise to a duty to maintain secrecy' "].)

Amgen argues that a holding that it lost trade secret protection by complying with Health and Safety Code section 127677 "raises significant due process and other constitutional questions that this Court should avoid," such as whether disclosure constitutes an unconstitutional taking of property. (See *People v. Garcia* (2017) 2 Cal.5th 792, 804 (*Garcia*) [under the doctrine of constitutional avoidance, "a statute should not be construed to violate the Constitution ' " 'if any other possible construction remains available' " ' "].)

We note again that Amgen has not challenged the constitutional validity of Senate Bill No. 17, either on appeal or below, but instead relies solely on Evidence Code 1060 and Government Code section 6254, subdivision (k) as a basis to bar disclosure under the CPRA. Even assuming arguendo that our interpretation of Senate Bill No. 17 implicates constitutional questions, Amgen has failed to persuade us of another

" ' " 'possible construction' " ' " (*Garcia, supra*, 2 Cal.5th at p. 804) of the relevant statutes. Amgen urges us to read into Senate Bill No. 17 confidentiality obligations and limitations on recipients' use of the price increase notice that the language and intent of the bill do not support. Absent those obligations and limitations, we must conclude, based on the plain language of Civil Code section 3426.1, subdivision (d) and case law interpreting it, that Amgen has failed to show a likelihood of prevailing on its claim that its price increase notice satisfied the statutory definition of a trade secret once it was disclosed to the registered purchasers and others. We will not, for the sake of avoiding potential constitutional questions, import confidentiality obligations and limitations into a statute that is not susceptible to such an interpretation.

Amgen also argues that interpreting Senate Bill No. 17 as we have would "create perverse incentives encouraging non-compliance." To the extent Amgen claims that the advance notice requirement is bad policy, that is for the Legislature to decide. We note again that the Legislature enacted Senate Bill No. 17 over the pharmaceutical manufacturers' express objection that the bill "requires the disclosure of commercially sensitive pricing information" "without confidentiality protections." (Assem. Com. on Appropriations, Analysis of Sen. Bill No. 17 (2017–2018 Reg. Sess.) as amended July 20, 2017, p. 4.) One could view Amgen's preliminary injunction motion as an attempt to obtain from the courts an outcome that the Legislature apparently rejected.

The parties debate at length whether the Legislature intended the price increase notices to be publicly available beyond those statutorily entitled to receive it. Whatever the

34

Legislature's intent, the effect of disclosure to the registered purchasers and customers of pharmacy benefit managers was the loss of secrecy essential to meeting the first prong of the UTSA trade secret definition. If the Legislature did not intend that effect, the Legislature may of course address the issue. Again, to the extent Amgen urges that we impose limitations on disseminating the price increase information once received by the registered purchasers and "large" pharmacy benefit manager customers, that is the Legislature's prerogative and not a matter for judicial fiat.

### D. The trial court abused its discretion by concluding that the balance of harms favored Amgen

The trial court's balancing of harms relied on the same reasoning as did its analysis of the trade secret claim: Because Amgen had disclosed its pricing information only to the limited number of registered purchasers, and not to the general public or its competitors, further dissemination of the information would be harmful to Amgen during the 60-day period defined in Senate Bill No. 17, tipping the balance of harms in its favor.

As set forth above, Amgen has failed to show that disclosure to the registered purchasers and pharmacy benefit manager customers had not already placed Amgen's price increase notice in the hands of those who would use it to their advantage and Amgen's detriment, thus causing the very harm Amgen sought to prevent with its preliminary injunction. The trial court's finding that "the audience to whom [Amgen] actually disclosed the pricing information was not [Amgen's] competitors" did not factor in this patent consequence of Amgen's disclosure or that this consequence was what the Legislature intended in

35

enacting Health and Safety Code section 127677 in the first place.

Amgen's claim of harm is undercut further by the fact that it ultimately discloses its purported trade secret publicly when it implements its price increases 60 days after notifying the registered purchasers. To the extent a competitor can divine "pricing strategy, internal decision-making, internal forecasts," and "roadmap[s] for Amgen's potential actions" from price listings, as Wan asserted, the competitor can do so once the prices are public. Similarly, at that time the competitor can engage in the conduct predicted by Wan, including undercutting Amgen's prices, dumping competing drugs on the market, starting a publicity campaign against Amgen, or negotiating deals with Amgen's customers. Amgen has failed to explain the benefit of delaying these purported consequences for 60 days, particularly when during that period, the registered purchasers can use the price increase notice without limitation to Amgen's detriment.

We also observe that Amgen's rival drug manufacturers are subject to the same advance notice requirements. Thus, whatever competitive disadvantage Amgen might suffer by disclosing its prices early is shared by its rivals. Amgen argues that some of its competitors may not comply with the notice requirements, but this is pure speculation.

Amgen contends that some of the information in its price increase notice may not become public after 60 days and therefore should be entitled to protection. Wan stated in her declaration, "Pursuant to SB 17, Amgen may implement the price increases at any point after notice or Amgen may decide not to implement the price increases at all. Furthermore, Amgen may

increase prices by any amount within the specified range contained in Amgen's notices."

Assuming arguendo Wan correctly characterized the requirements of Senate Bill No. 17, she provided no evidence suggesting that Amgen actually has, or would, avail itself of these options. Her assertions appear to us to be mere argument. They also appear to be internally inconsistent. Given Amgen's concern for the harm public dissemination of its pricing may cause, it seems unlikely Amgen would announce any prices it was not going to implement within 60 days. Indeed, were Amgen to disclose a proposed price increase and later retreat from implementing that increase, that conduct could call into question Amgen's claim that it had made "efforts that are reasonable under the circumstances to maintain . . . secrecy." (Civ. Code, § 3426.1, subd. (d)(2).)

Amgen argues that "public disclosure of trade secret information constitutes irreparable harm as a matter of law." This argument presupposes that Amgen's price increase notice remained a trade secret after its disclosure to the registered purchasers and customers of pharmacy benefit managers. As we have already explained, we disagree with that assertion.

## DISPOSITION

The order granting the preliminary injunction is reversed. California Correctional Health Care Services is awarded its costs on appeal.

<u>CERTIFIED FOR PUBLICATION.</u>


                                        BENDIX, J.

We concur:



ROTHSCHILD, P. J.



WEINGART, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.